Clifford AVERY, et al.

v.

Ronald POWELL, Commissioner, New Hampshire State Department of Corrections and Michael Cunningham, Warden, New Hampshire State Prison, in their individual and official capacities.

Civ. No. 88–7–D.

United States District Court,
D. New Hampshire.

Aug. 29, 1988.

Clifford Avery, Concord, N.H., pro se.

Dennis R. Cookish, Concord, N.H., pro se.

Daniel J. Mullen, Asst. Atty. Gen., Concord, N.H., for defendants.

## MEMORANDUM AND ORDER

DEVINE, Chief Judge.

Plaintiff Clifford Avery, an inmate incarcerated in the New Hampshire State Prison ("NHSP"),[1] brings this *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 against defendants as NHSP officials and in their personal capacities. In his amended complaint, plaintiff claims that his continuous exposure to passive tobacco smoke as a condition of confinement violates the Eighth, Fifth, and Fourteenth Amendments to the United States Constitution and state law. Plaintiff seeks a declaratory judgment that defendants' actions are unconstitutional and an injunction requiring the separation of the prison into smoking and

---

1. Although Clifford Avery is the only inmate specifically mentioned in this Order, numerous other inmates have intervened as plaintiffs, and this Order shall have application to all plaintiffs.

nonsmoking areas; he also seeks monetary damages. Jurisdiction is asserted pursuant to 28 U.S.C. § 1343(a) and the doctrine of pendent jurisdiction.

At bar are defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., and plaintiff's motions for (1) a temporary restraining order and/or a preliminary injunction, Rule 65(a)–(b), Fed.R.Civ.P.; (2) class certification, Rule 23(a)–(b), Fed.R.Civ.P.; and (3) amendment of the complaint to add as a defendant the Unit Manager of the halfway house where plaintiff has resided, Rule 15(a), Fed.R.Civ.P. The Court resolves the motions on the documents as filed. *See* Rule 11(g), Rules of the United States District Court for the District of New Hampshire.

## Discussion

### I. Defendants' Motion to Dismiss

Plaintiff's complaint presents this Court with a constitutional issue of first impression in this judicial circuit: whether a prisoner's constant, involuntary exposure to passive tobacco smoke is violative of his rights under the Eighth or Fourteenth Amendments to the United States Constitution, the New Hampshire Constitution, or New Hampshire state law. Defendants move to dismiss, asserting that this cause of action does not state a claim upon which relief may be granted.

In resolving a Rule 12 motion to dismiss, the Court must determine whether, based on the claims contained in the complaint, plaintiff is entitled to offer evidence. *V.S. H. Realty, Inc. v. Texaco,* 757 F.2d 411, 414 (1st Cir.1985) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). The Court's consideration is limited to the allegations of the complaint, *Litton Indus. v. Colon,* 587 F.2d 70, 74 (1st Cir.1978), and such allegations are "construed in the light most favorable to plaintiff and taken as admitted, with dismissal to be ordered only if the plaintiff is not entitled to relief under any set of facts he could prove," *Chasan v. Village*

*Dist. of Eastman,* 572 F.Supp. 578, 579 (D.N.H.1983) (and citations therein), *aff'd without opinion,* 745 F.2d 43 (1st Cir. 1984); *see also Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987). *Pro se* complaints are to be liberally construed and are held to a less stringent standard than pleadings drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam); *Lyons v. Powell,* 838 F.2d 28, 31 (1st Cir.1988). Therefore, for the purpose of this motion, the facts as stated by plaintiff in his complaint and as summarized below are accepted as true.

At the time his complaint was filed, plaintiff was one of approximately two hundred inmates incarcerated in the Medium North and Medium South Units of the New Hampshire State Prison. These Units consist of three floors each with four "pods" to a floor. Each pod consists of ten cells, a common day room, and a bathroom. Each cell on the first and second floors of each Unit houses two inmates per cell; the third floor of each Unit houses one inmate per cell. The Medium North and Medium South Units share a common air flow system which circulates air and heat between the pods.

Plaintiff is a nonsmoker. There is no Department of Corrections policy which separates nonsmoking inmates from inmates who smoke. The lack of such a policy subjects plaintiff and other nonsmokers to constant and involuntary inhalation of tobacco smoke. Plaintiff contends that tobacco smoke contains a number of toxic substances and that these substances have a long-term pernicious effect on his health.

### A. The Eighth Amendment Claim

Although "there was a time ... when prisoners had no rights," *Sostre v. Preiser,* 519 F.2d 763, 764 (2d Cir.1975), it is now beyond question that individuals convicted of crimes retain certain constitutional rights, including rights protected by the Eighth Amendment,[2] *Bell v. Wolfish,* 441

---

**2.** The history of the Eighth Amendment and the "parade of horrors" which may have contributed to its enactment are reviewed in *Furman v.* *Georgia,* 408 U.S. 238, 314–33, 92 S.Ct. 2726, 2764–74, 33 L.Ed.2d 346 (1972) (per curiam) (Marshall, J., concurring).

U.S. 520, 535 n. 16, 545, 99 S.Ct. 1861, 1872 n. 16, 1877, 60 L.Ed.2d 447 (1979); *see also City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983).

The Eighth Amendment proscribes punishment that is cruel and unusual, *Thompson v. Oklahoma*, — U.S. —, 108 S.Ct. 2687, 2691, 101 L.Ed.2d 702 (1988) (plurality opinion); *Rhodes v. Chapman*, 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); *Hawkins v. Hall*, 644 F.2d 914, 917 (1st Cir.1981), and is applicable to the states through the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). Although the United States Supreme Court has not crafted a specific definition of what constitutes cruel and unusual punishment, it has "interpreted these words 'in a flexible and dynamic manner,' and has extended the Amendment's reach beyond the barbarous physical punishment at issue in the Court's earlier cases." *Rhodes, supra*, 452 U.S. at 345, 101 S.Ct. at 2398 (citation omitted).

In *Rhodes*, the Court considered for the first time the limitation that the Eighth Amendment imposes upon conditions of confinement:

> Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain' or are grossly disproportionate to the severity of the crime. Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'

*Id.* at 346, 101 S.Ct. at 2399 (citation omitted). The court stated that "no static test" exists to assist the courts in determining when conditions of confinement are cruel and unusual, *id.*,[3] and observed that "the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society,'" *id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). *See also Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910) ("Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth.").

The *Rhodes* court held that evolving standards of decency are to be determined with reference to "objective factors to the maximum possible extent." *Rhodes, supra*, 452 U.S. at 346, 101 S.Ct. at 2399 (citation omitted). In his concurring opinion, Justice Brennan noted that the use of experts can be of assistance to the courts in objectively evaluating the standards for confinement, "but in the end, the court attempting to apply them is left to rely upon its own experience and on its knowledge of contemporary standards." *Id.* 452 U.S. at 364 & n. 12, 101 S.Ct. at 2409 & n. 12 (Brennan, J., concurring) (citing *Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 2868, 53 L.Ed.2d 982 (1977)) (plurality opinion).

In construing the *Rhodes* standard in connection with prison conditions, the First Circuit Court of Appeals has held that

> "*Rhodes* ... makes clear that discomfort compelled by conditions of confinement, without more, does not violate the Eighth Amendment, that wanton, unnecessary, or grossly disproportionate imposition of restraints does violate the amendment, as does a serious deprivation of basic human needs, viewed under current standards defining 'the minimal civilized measure of life's necessities.'"

*Jackson v. Meachum*, 699 F.2d 578, 581–82 (1st Cir.1983) (citations omitted). The First Circuit has also stated that "the Eighth Amendment prevents only conditions of

---

**3.** But as Justice Brennan noted in his concurrence,

> [i]n determining when conditions pass beyond legitimate punishment and become cruel and unusual, the 'touchstone is the effect upon the imprisoned.' ... When 'the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates ...,' the court must conclude that the conditions violate the constitution.

*Rhodes, supra*, 452 U.S. at 364, 101 S.Ct. at 2408 (Brennan, J., concurring) (quoting *Laaman v. Helgemoe*, 437 F.Supp. 269, 323 (D.N.H.1977)).

confinement that involve the wanton and unnecessary infliction of pain, that deny basic human needs or that are grossly disproportionate to the severity of the crime warranting imprisonment." *Santana v. Collazo,* 714 F.2d 1172, 1179 (1st Cir.1983) (citing *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

This review of Eighth Amendment jurisprudence demonstrates that in order to decide the instant question, the Court must decide whether constant, involuntary exposure to tobacco smoke rises to the level of punishment or whether such exposure is merely part of the discomfort which must be endured as a consequence of being sentenced to prison. If the Court finds that exposure to environmental tobacco smoke (hereinafter "ETS") does constitute punishment, it must then decide whether the punishment offends society's evolving standards of decency.

### 1. ETS as Punishment

■ Defendants argue that no violation of the prohibition against cruel and unusual punishment can be found absent the infliction of actual physical pain. The Court disagrees.

The state acquires the power to punish an individual after it has secured a formal adjudication of guilt in accordance with due process of law, *City of Revere, supra,* 463 U.S. at 244, 103 S.Ct. at 2983, and it is punishment that is subject to scrutiny under the Eighth Amendment, *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). In both *Hutto* and *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court began its analysis by noting that the "Eighth Amendment's ban ... 'proscribe[s] more than physically barbarous punishments.' It prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Hutto, supra,* 437 U.S. at 685, 98 S.Ct. at 2570 (quoting *Gamble, supra,* 429 U.S. at 102, 97 S.Ct. at 290) (citation omitted). From these precedents the *Rhodes* court conclud-

ed: "Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble, supra,* [429 U.S.] at 103–104 [97 S.Ct. at 290–291]." *Rhodes, supra,* 452 U.S. at 347, 101 S.Ct. at 2399.

■ Thus, conditions of confinement must be judged against society's evolving standards of decency, not in relation to whether the punishment inflicts actual physical pain. *See Trop v. Dulles, supra,* 356 U.S. at 101, 78 S.Ct. at 598 (denationalization considered punishment). This principle has served as a guide for numerous courts in overturning as cruel and unusual punishment practices which had long been accepted, *see, e.g., Cunningham v. Jones,* 567 F.2d 653, 657 (6th Cir.1977) (bread and water diet) (quoting *Landman v. Royster,* 333 F.Supp. 621, 647 (E.D.Va.1971)); *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir. 1968) (use of the strap), or conditions which make intolerable otherwise constitutional terms of imprisonment, *Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Martinez v. Chavez,* 574 F.2d 1043, 1046 (10th Cir.1978) (suffocating jail conditions); *Fischer v. Winter,* 564 F.Supp. 281, 301 (N.D.Cal.1983) (totality of prison conditions unconstitutional), and it is the principle which guides the Court in resolving the issue it faces in the instant action.

Defendants argue that exposure to ETS is at most a discomfort and that mere discomfort is not violative of the Eighth Amendment. *See Rhodes, supra,* 452 U.S. at 349, 101 S.Ct. at 2400. Plaintiff, on the other hand, alleges that constant exposure to ETS imperils his physical health because tobacco smoke contains components such as carbon monoxide, nicotine, hydrocyanic acid, ammonia, and formaldehyde, as well as substances which are pharmacologically active, toxic, cancer causing, or cancer promoting in healthy nonsmokers, and for which there is no known safe level of exposure. Numerous courts have held that in-

voluntary exposure to an environment which may cause disease or death is violative of the Eighth Amendment. *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (lack of adequate ventilation and air flow); *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983) (intentionally subjecting inmates to cold, rainy, roach-infested facility); *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir.) (constant exposure of inmates to persons with contagious diseases), *cert. dismissed*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), *rev'd on other grounds*, 790 F.2d 1174, 1175 (5th Cir.1986); *Cunningham v. Jones, supra*, 567 F.2d at 660 (restricting inmates to meals with insufficient calories to maintain health); *Gates v. Collier*, 349 F.Supp. 881, 894 (N.D.Miss.1972) (confinement in barracks that threaten physical health), *aff'd* 501 F.2d 1291 (5th Cir.1974). Therefore, if the weight of scientific authority is such that there may be significant health consequences from involuntary exposure to tobacco smoke, then plaintiff's claim rises beyond mere discomfort and becomes punishment cognizable under the Eighth Amendment.

Investigation into the adverse health effects of the direct ingestion of tobacco smoke began in earnest with the release of the first Surgeon General's Report in 1964, which indicated a possible link between the direct ingestion of tobacco smoke and lung cancer.[4] As a result of this report, Congress mandated that a warning concerning the possible link between smoking and adverse health effects be placed on cigarette packages.[5]

In 1970, in response to mounting scientific evidence that tobacco smoke did indeed have adverse health effects, Congress strengthened the warnings to state unequivocally that smoking tobacco was dangerous to health.[6] It is now generally accepted within the scientific community that the direct ingestion of tobacco smoke results in adverse health effects, *see* Public Health Service, U.S. Dep't of Health, Educ., and Welfare, *The Health Consequences of Smoking*, A Report of the Surgeon General 117–35 (1972),[7] and the focus of scientific research into the health consequences of tobacco smoke is presently shifting toward the effects of environmental tobacco smoke on nonsmokers.

In 1986 the Surgeon General released a report entitled "The Health Consequences Of Involuntary Smoking" (hereinafter "1986 Report").[8] The preface to the 1986 report states: "It is now clear that disease risk due to the inhalation of tobacco smoke is not limited to the individual who is smoking, but can extend to those who inhale tobacco smoke emitted into the air." The report itself reaches three major conclusions: (1) that involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers; (2) that the children of parents who smoke compared with the children of nonsmoking parents have an

---

4. U.S. Dep't of Health, Educ. and Welfare, *The Health Consequences of Smoking*, Rep. of the Surgeon General (1964).

5. Pub.L. No. 89–92, § 4, 79 Stat. 283 (1965) (codified as amended at 15 U.S.C.A. § 1333 (West Supp.1988)) ("Caution: Cigarette Smoking May Be Hazardous To Your Health.")

6. Pub.L. No. 91–222 § 2, 84 Stat. 88 (1970) (codified as amended at 15 U.S.C.A. § 1333 (West Supp.1988)) ("Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health.") In 1984, Congress further amended the warning statute to substitute a series of specific warnings for the one general warning. 15 U.S.C.A. § 1333 (West Supp.1988):

(1) "Surgeon General's Warning: Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy."

(2) "Surgeon General's Warning: Quitting Smoking Now Greatly Reduces Serious Risks To Your Health."

(3) "Surgeon General's Warning: Smoking By Pregnant Women May Result In Fetal Injury, Premature Birth, And Low Birth Weight."

(4) "Surgeon General's Warning: Cigarette Smoke Contains Carbon Monoxide."

7. The Surgeon General has also determined that the primary chemical component of tobacco, nicotine, is as addictive a substance as heroin or cocaine. Public Health Service, United States Department of Health and Human Services, *The Health Consequences of Smoking: Nicotine Addiction*, a Report of the Surgeon General (1988).

8. U.S. Dep't of Health and Human Services, Public Health Service (1986).

increased frequency of respiratory infections, increased respiratory symptoms, and slightly smaller rates of increased lung function as their lungs mature; and (3) that the simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke. *Id.* at 7. On the strength of the research contained in the report and the conclusions which are drawn, the Surgeon General states,

> the time for delay is past; measures to protect the public health are required now. The scientific case against involuntary smoking as a health risk is more than sufficient to justify appropriate remedial action, and the goal of any remedial action must be to protect the nonsmoker from environmental tobacco smoke.

*Id.* at xii; *see also* Special Projects Office of the Health Program, Office of Technology Assessment, United States Congress, *Passive Smoking in the Workplace: Selected Issues* (May 1986); Robertson & Burge, *Building Sickness—All In The Mind?*, Occupational Health, March 1986, at 78; Godish, *Indoor Air Pollution in Offices and Other Non-Residential Buildings*, 48 J. of Envtl. Health 190–95 (No. 4, 1986).

The Surgeon General's 1986 conclusion is not without its critics. A review of the literature on the health effects of ETS by W. Allan Crawford, Ph.D., an independent consultant in Occupational and Environmental Health, Sydney, Australia, concluded: "With the possible exception of infants who are 1 yr old or less, available data do not meet the criteria for scientific and public health decisions." Crawford, *On the Health Effects Of Environmental Tobacco Smoke*, Archives of Envtl. Health, 34 (1987) (and references cited therein).

Plaintiff, therefore, presents this Court with a question which is generating a significant dispute among recognized scientific authorities. If the Surgeon General is correct, plaintiff is being exposed to an environment which may be implanting within him a biological time bomb which could go off shortly after, or years after, the end of his term of incarceration.

The Court's research has disclosed only three Eighth Amendment cases relevant to the question of whether ETS may be considered punishment.[9] In the first case, *Lee v. Carlson*, 645 F.Supp. 1430 (S.D.N.Y. 1986), *aff'd mem.*, 812 F.2d 712 (2d Cir. 1987), the court dismissed the action without reaching the merits of the Eighth Amendment claim, reasoning that the defendants enjoyed qualified immunity. *Id.* at 1438. In the second case, *Beeson v. Johnson*, 668 F.Supp. 498 (E.D.N.C.1987), the Court construed an inmate's ETS claim as deliberate indifference to medical care because the inmate was suffering from a preexisting medical condition, and thus avoided the constitutional issues here in controversy. *Id.* at 500.

The third case, *Sampson v. King*, 693 F.2d 566 (5th Cir.1982), involved the use of pesticides at a prison farm. Plaintiff alleged that his exposure while working in the fields to the pesticide Parathion constituted cruel and unusual punishment. The district court granted damages and an injunction prohibiting further use of the pesticide. On appeal, the Fifth Circuit Court of Appeals reversed.

The court of appeals began its analysis by noting, in light of *Rhodes*, that prison conditions must be evaluated on the basis of objective factors as weighed against contemporary standards of decency. *Id.* at 569. The court then noted that the state has a responsibility to protect the safety of prisoners, but declined to hold the operation of a prison to the same safety and

---

**9.** Three courts have addressed the constitutionality of exposure to ETS in non-Eighth Amendment contexts. *See Kensell v. Oklahoma*, 716 F.2d 1350 (10th Cir.1983); *Federal Employees for Non–Smokers Rights (FENSR) v. United States*, 446 F.Supp. 181 (D.D.C.1978); *Gasper v. Louisiana Stadium and Exposition Dist.*, 418 F.Supp. 716 (E.D.La.1976), *aff'd*, 577 F.2d 897 (5th Cir.1978). Although the court in each case declined to hold that exposure to ETS was violative of the United States Constitution, the decisions predate the 1986 Surgeon General's Report and therefore are not dispositive of the instant question.

health standards applicable to private industry. *Id.* The court reasoned that because Parathion was regularly used by private farmers, and because there was no showing that prison officials knew or should have known that the pesticide was dangerous, granting of the injunction was an abuse of discretion. *Id.* The court concluded by dismissing the damages claim because plaintiff had failed to show that defendants had violated any clearly established law. *Id.*

Both the instant case and *Sampson* involve the exposure of prison inmates to a potentially harmful substance within the prison environment, and the *Sampson* analysis is set against the Eighth Amendment standard established by *Rhodes*. However, the Court finds the reasoning used in *Sampson* unpersuasive.

■ First, simply because a practice is regularly used does not protect it from being proscribed by the Eighth Amendment. *See Jackson v. Bishop, supra,* 404 F.2d at 579; *Cunningham v. Jones, supra,* 567 F.2d at 657. Second, as discussed below, current community attitues toward ETS indicate an intolerance not evidenced by the farming community in *Sampson* toward the use of the agricultural pesticide. Finally, scientific evidence exists, and it is generally widely accepted, that secondary tobacco smoke may pose a health hazard. Accordingly, this Court will not extend the reasoning applied in *Sampson* to the instant controversy.

■ The question remains, therefore, whether exposure to ETS may be viewed as punishment cognizable under the Eighth Amendment. Defendants' argument that the Eighth Amendment only precludes punishment which involves physical pain is, for the reasons stated, unpersuasive. Medical opinions on the risk of ETS are not uniform, and relevant Eighth Amendment case law is not helpful in providing an

answer. Nonetheless, the Court cannot say at this stage of these proceedings that plaintiff will be unable to show at trial that exposure to ETS is dangerous to his physical health. A motion to dismiss should be granted only if the plaintiff is not entitled to relief under any set of facts he could prove. *Chasan v. Village Dist. of Eastman, supra,* 572 F.Supp. at 579. Having found that the Eighth Amendment proscribes more than physical pain, the Court therefore finds and rules that exposure to ETS is not merely discomforting and that conditions of plaintiff's confinement may constitute punishment cognizable under the Eighth Amendment.

### 2. Evolving Standards of Decency

Deciding that the exposure to ETS may constitute punishment does not end the Court's inquiry. The Eighth Amendment prohibits only punishment which is cruel and unusual. Accordingly, the second step in the Court's analysis is determining whether exposure to ETS violates society's evolving standards of decency.

A recent United States Supreme Court decision provides guidance in this difficult task. The court in *Thompson v. Oklahoma, supra,* —— U.S. at ——, 108 S.Ct. 2687, was faced with determining whether a sentence of death for those who committed crimes while they were minors violates the Eighth Amendment. The plurality began by restating that the authors of the Eighth Amendment made no attempt to define the contours of cruel and unusual punishment, but "delegated that task to future generations of judges who have been guided by the 'evolving standards of decency that mark the progress of a maturing society.'" *Id.* 108 S.Ct. at 2691 (citation omitted). The court then determined society's evolving standards of decency by reviewing the work product of the state legislatures and of sentencing juries. *Id.*[10]

---

**10.** Although the plurality and the dissent disagreed on the proper evaluation of the evidence available, the dissent did agree that "[t]he most reliable objective signs [of society's evolving standard] consist of the legislation that the soci-

ety has enacted." *Thompson, supra,* —— U.S. at ——, 108 S.Ct. at 2715 (Scalia, J., dissenting).

Justice O'Connor joined the plurality opinion to the extent that she agreed that the actions of state legislatures provided some evidence of the existence of a national consensus on which a

As of 1987, forty-five states and the District of Columbia had enacted legislation regulating tobacco use. *See* Kershenblatt, *An Overview of Current Tobacco Litigation and Legislation,* 8 U.Bridgeport L.Rev. 133 (1987) (Appendix).[11] Although some of this legislation is directed toward fire safety, *id.,* a significant percentage specifically restricts the exposure to ETS. An example is Rhode Island's legislation, which states:

> The uses of tobacco for smoking purposes is being found to be increasingly dangerous, not only to the person smoking, but also to the non-smoking person who is required to breathe such contaminated air. The most pervasive intrusion of the non-smoker's right to unpolluted air space is the uncontrolled smoking in public places. The legislature intends, by the enactment of this chapter, to protect the health and atmospheric environment of the non-smoker by regulating smoking in certain public areas.

R.I.Gen.Laws § 23–20.6–1 (1985).

The State of New Hampshire has enacted legislation regulating smoking in enclosed public places and in the workplace. N.H.Rev.Stat.Ann. 155:45–53 (Equity Supp. 1987). Enclosed public places are defined as "any enclosed, indoor area which is publicly owned or supported by tax revenues." *Id.* 155:45. Prisons are tax supported institutions, and the legislation contains no indication that they are exempt from the law. The New Hampshire Legislature, in enacting legislation restricting smoking in the workplace, specifically found that "the smoking of tobacco ... is a danger to health ... to those who are present in confined spaces." *Id.* 155:50.

Legislation restricting exposure to ETS is not limited to the states. The federal government has enacted legislation prohibiting exposure to ETS on scheduled airline flights of two-hour duration or less. 49 U.S.C.A.App. § 1374(d) (West Supp.1988). Individual federal agencies have also enacted smoking regulations pursuant to their rule-making authority. *See* 41 C.F.R. § 101–20.105–3 (1987) (regulations for controlling smoking in GSA-controlled buildings and facilities); 49 C.F.R. § 1061 (1987) (limitation of smoking on interstate passenger-carriers). And, significantly, the warden in a federal prison has the authority to establish no-smoking areas within the institution. 28 C.F.R. § 551.160 (1987). Even that stalwart bastion of the smoke-filled room, the American political convention, has banned smoking from its midst. *The [Manchester, New Hampshire] Union Leader,* July 19, 1988, at 1, col. 4.

■ This Court is cognizant of the difficulty of extrapolating from legislative enactments a finding that the exposure to ETS violates society's standards of decency. However, those objective factors, buttressed by significant scientific authority, indicate that tobacco smoke may be a harmful and possibly lethal indoor pollutant. Therefore, because "the touchstone [of cruel and unusual punishment] is the effect upon the imprisoned," *Rhodes, supra,* 452 U.S. at 364, 101 S.Ct. at 2408 (Brennan, J., concurring), and because society has recognized that exposure to ETS may be a potentially significant danger to health, this Court finds for the purposes of this motion that, because plaintiff might establish that his constant involuntary exposure to ETS is harmful to his health, he has stated a claim for cruel and unusual punishment under the Eighth Amendment. Defendants' motion to dismiss plaintiff's Eighth Amendment claim (document no. 10) is therefore denied.

### B. Fourteenth Amendment Claim

Defendants also argue that plaintiff fails to state a claim under the Fifth or Fourteenth Amendments because an inmate in a state prison has no liberty interest in remaining in a particular cell. Defendants

---

determination of society's standards could be based. *Id.* 108 S.Ct. at 2706.

**11.** Legislation regulating exposure to ETS is not unique to the United States. The Canadian Parliament recently approved legislation described as "the toughest in the world", which, along with other measures, requires a smoke-free environment in federal buildings. *The Boston Globe,* June 30, 1988, at 3, col. 1.

assert that the choice of institution in which a prisoner is confined, his or her security classification within that institution, and the assignment of roommates are all matters of institutional security for which prison administrators must be accorded wide-ranging deference. *See Bell v. Wolfish, supra,* 441 U.S. at 547, 99 S.Ct. at 1878.

■ In order for a prisoner's interest to be cognizable under the Fourteenth Amendment, it must contain "real substance and [be] sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed. 2d 935 (1974). Fourteenth Amendment Due Process Rights are invoked if there is a deliberate decision by a government official to deprive a person of life, liberty, or property, *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); however, the mere lack of due care in causing an injury to life, liberty, or property is insufficient to trigger due process rights, *id.* at 333, 106 S.Ct. at 666.

Plaintiff claims as a liberty interest the right to live in an environment which is not dangerous to his physical health. He asserts that prison officials have denied him his due process rights by refusing to provide a smoke-free living environment and by refusing to adopt a process to address this concern.

■ "Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective." *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–695, 98 L.Ed. 884 (1954). This Court found above that the exposure to ETS may imperil plaintiff's physical health. It cannot be gainsaid that a serious threat to physical health implicates a liberty interest protected by the Fourteenth Amendment. Therefore, taking plaintiff's allegations as true, the decision by defendants to maintain plaintiff in

a dangerous environment may be construed as a deliberate decision which is not reasonably related to any proper governmental objective, and thus it may deprive plaintiff of his liberty rights without due process. Accordingly, plaintiff states a claim under the Fourteenth Amendment, and defendants' motion to dismiss this claim (document no. 10) must be denied.

### C. Pendent State Law Claims

■ Defendants argue that plaintiff's state law claims are barred from being heard in this court by the Eleventh Amendment. *See Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars federal courts from exercising jurisdiction over state law suits against state officials, regardless of whether the relief sought is prospective or retroactive. *Id.* at 106, 104 S.Ct. at 911. This jurisdictional bar applies if the official is acting within his official capacity, *id.,* and it "applies as well to state law claims brought into federal court under pendent jurisdiction," *id.* at 121, 104 S.Ct. at 919. An exception to the bar occurs if the suit challenges a state official's action under the federal constitution. *Id.* at 102, 104 S.Ct. at 909 (citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

Plaintiff asserts that defendants, while acting in their capacities as state officials, violated the New Hampshire Constitution and state law pertaining to the operation of the prison system. These claims are based solely on state law; accordingly, they are barred by the Eleventh Amendment. Defendants' motion to dismiss plaintiff's pendent state law claims (document no. 10, counts 3, 4, 5, and 6) is granted.

### D. Qualified Immunity

■ The defense of qualified immunity is available to state prison administrators who are acting in good faith to discharge the legal obligations of their office. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). To

qualify for this affirmative defense, the state officials must be performing discretionary functions, the challenged acts must fall within the scope of their authority, and the acts must be of the type typically performed in that official role. *Knight v. Mills, supra,* 836 F.2d at 665–66. Although the exercise of discretionary judgment by the state official is the cornerstone to the defense of qualified immunity, the defense fails if the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Defendants assert that they are entitled to qualified immunity from damages because they were performing duties within the scope of their employment and because the law was not clearly established at the time they acted. The defendants are prison officials exercising discretionary judgment in overseeing the administration and implementation of prison policies. Moreover, there is no question that at the time defendants acted there was no clearly established constitutional right entitling plaintiff to be incarcerated in an environment free of tobacco smoke. Accordingly, defendants are entitled to qualified immunity from civil damages in their personal capacities.

## II. Plaintiff's Motion for a Temporary Restraining Order and/or a Preliminary Injunction

Subsequent to defendants' motion to dismiss and plaintiff's objection thereto, plaintiff moved this Court for a temporary restraining order [12] and/or a preliminary injunction.[13]

Entitlement to the extraordinary relief of preliminary injunction requires the movant to prove (1) that without injunctive relief the movant will suffer irreparable injury, (2) that such injury outweighs the harm the injunction will cause the opposing party, (3) that movant has shown a likelihood of success on the merits, and (4) that the injunction is consistent with "the public interest". *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). "The heart of the matter is whether 'the harm caused [movant] without the injunction, *in light of* the [movant's] likelihood of eventual success on the merits, outweighs the harm the injunction will cause [the opposing party].'" *United Steelworkers of America v. Textron, Inc.,* 836 F.2d 6, 7 (1st Cir.1987) (quoting *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987)) (emphasis in original).

The factual predicates to this action are not in dispute: separate smoking areas do not exist in the prison, and non-smoking prisoners are exposed involuntarily to ETS. Therefore, the only evidence which would be heard on the motion for a preliminary injunction would involve the same evidence, presumably expert and statistical testimony, necessary to prove the case at trial. In a situation such as this, in which all the evidence and arguments on the validity of a preliminary injunction appear to be relevant to trial on the merits, it is appropriate to consolidate the preliminary injunction hearing with the trial on the merits. *E.g., Hess v. Houghs,* 500 F.Supp. 1054, 1056 (D.Md.1980).

Accordingly, pursuant to Rule 65(a)(2), Fed.R.Civ.P., the Court orders that the trial of this action on the merits be advanced and consolidated with the evidentiary hear-

---

**12.** At the discretion of the Court, plaintiff's motion for a temporary restraining order is denied. *See Anheuser–Busch, Inc. v. Teamsters Local No. 633,* 511 F.2d 1097, 1099 (1st Cir.), *cert. denied,* 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975).

**13.** Defendants' claim that plaintiff's request for injunctive relief is moot because plaintiff has been released from the prison system is without legal merit. The Court concludes that plaintiff's

claim is an appropriate instance of the "capable of repetition yet evading review" exception to the mootness doctrine. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). Moreover, the addition of the five intervenors to the action continues the action as a case-or-controversy subject to judicial review. *Id.* at 396, 100 S.Ct. at 1208.

ing on the application for a preliminary injunction.

## III. Plaintiff's Motion for Class Certification

Plaintiff moves that the Court certify this action as a class action pursuant to Rule 23, Fed.R.Civ.P. The district court "is accorded broad discretion in determining whether a suit should proceed as a class action." *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 960 (D.C.Cir.1985); *Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st Cir.1985).

There are four prerequisites which must be met to allow certification of a class: (1) the class must be sufficiently numerous so that joinder of all members is impracticable; (2) the controlling questions of law or fact must be common to the class; (3) the claims or defenses of the representative parties must be typical of the class; and (4) the representative parties must be able to fairly and adequately protect the class. Rule 23(a), Fed.R.Civ.P. If a plaintiff has satisfied this burden, then the Court must examine three additional factors before granting certification: (1) whether the party opposing the class has refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole; (2) whether individual members' interests predominate over common interests; and (3) whether the class action is superior to other methods of adjudicating the controversy. Rule 23(b)(2)–(3), Fed.R.Civ.P. *See, e.g., Weiss v. York Hospital*, 745 F.2d 786 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

The burden is on the party seeking class certification to establish his right to do so, and he "must satisfy all four of the prerequisites contained in Rule 23(a) and then demonstrate that the class he seeks to represent falls within one of the sub-categories of rule 23(b)." *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). Plaintiff in the instant action is acting *pro se*. A *pro se* plaintiff may not possess the knowledge and experience necessary to protect the interests of the class as required by Rule 23(a)(4). *See* 7B Wright, Miller & Kane, *Federal Practice and Procedure* § 1769.1, at 380 (West 1986) (and citations therein).[14] This danger is especially relevant to a case involving a constitutional issue of first impression requiring complex statistical and medical evidence. The Court, therefore, finds that plaintiff is not an adequate representative of the class as required by Rule 23(a)(4). Plaintiff's motion for class certification (document no. 28) is denied. Said denial is without prejudice to plaintiff's right to request class certification at a later date if he obtains legal representation.

## IV. Plaintiff's Motion to Add a Defendant

Plaintiff has moved to amend his complaint a second time to join Karen Cann, Unit Manager of the Concord Halfway House, as a defendant pursuant to Rule 15, Fed.R.Civ.P. Plaintiff claims that the Unit Manager has responsibility for the operation and management of the halfway house and for the implementation of a smoking policy. Defendants object to joinder, but in the alternative move the Court to apply their motion to dismiss to the new defendant. Rule 10(c), Fed.R.Civ.P.

The allowance of further amendment after a responsive pleading has been filed lies in the discretion of the district court. *Kartell v. Blue Shield of Mass., Inc.*, 687 F.2d 543, 550 (1st Cir.1982). The Concord Halfway House is a facility

---

**14.** Rule 23(a) has two parts:
The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation. Adequate representation is particularly important because of the res judicata implications of a class judgment. If the case is not properly and vigorously conducted, either plaintiffs or defendants or both will suffer the consequences of being bound by the resulting judgment.
*Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986).

within the NHSP system. Karen Cann, as Unit Manager, is responsible for the implementation of NHSP policies at the Halfway House. The Court finds, therefore, that Karen Cann is a proper defendant, and plaintiff's motion to join her to the action is granted. Defendant Cann is allowed to join the original defendants in their motion to dismiss, and the Court's conclusions with respect to the motion apply to the additional defendant.

### Conclusion

For the reasons stated above, defendants' motion to dismiss plaintiff's Eighth and Fourteenth Amendment claims (document no. 10) is denied. Defendants' motion to dismiss plaintiff's pendent state law claims and the claim for monetary damages (document no. 10, counts 3, 4, 5, and 6) is granted.

Plaintiff's motion to certify this action as a class action (document no. 28) is denied without prejudice. Plaintiff's motion to add an additional defendant (Karen Cann) is granted. Plaintiff's motion for preliminary injunction is consolidated with the trial on the merits and will be addressed at that time.

SO ORDERED.