**William McKINNEY,**
**Plaintiff–Appellant,**

v.

**Pat ANDERSON; Carol Ployer; H.L. Whitley; George W. Sumner; John Nye, Defendants–Appellees.**

No. 89–16589.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 6, 1990.[*]

Decided Feb. 1, 1991.

* The panel unanimously found this case suitable for decision without oral argument. Fed.R.

App.P. 34(a) and Ninth Circuit Rule 34–4.

William McKinney, Carson City, Nev., in pro per.

Kevin G. Higgins, Deputy Atty. Gen., Carson City, Nev., for defendants-appellees.

Before BROWNING, PREGERSON, and TROTT, Circuit Judges.

PREGERSON, Circuit Judge:

William McKinney, a prisoner in Nevada state prison in Carson City, filed a pro se civil rights complaint in United States District Court under 42 U.S.C. § 1983. McKinney, a non-smoker, alleged that he is almost constantly exposed to secondary cigarette smoke, also known as environmental tobacco smoke (ETS), because he is housed with a heavy smoker and there are no restrictions on smoking in the prison. McKinney complained that the exposure to ETS caused him nosebleeds, headaches, chest pains, and loss of energy. McKinney stated that the prison officials repeatedly denied his requests to be transferred to a single room or to be housed with a non-smoker.

McKinney asserts two distinct Eighth Amendment claims. First, he alleged that prison officials were deliberately indifferent to his serious existing medical symptoms, which he asserts were caused by exposure to ETS. Second, he asserts that his exposure to ETS constitutes cruel and unusual punishment. McKinney also asserts that prison officials denied him due process of law by their refusal to apply a Nevada anti-smoking statute to the prison library. McKinney sought damages and injunctive relief to remedy the alleged violations of his constitutional rights.

Individuals named as defendants are George Sumner, the director of the prison; H.L. Whitley, the warden; Pat Anderson, the associate warden; Carol Ployer, a unit counselor; and John Nye, the store manager at the prison.[1] All are employees of the Nevada Department of Prisons.

---

1. McKinney also named two cigarette manufac- turers and a distributor of cigarettes sold in the

All proceedings in this action were conducted before a magistrate. Pursuant to Fed.R.Civ.P. 65, she consolidated McKinney's motion for preliminary injunctive relief with the trial on the merits. The magistrate also denied McKinney's motion to appoint an expert to testify about the health effects of ETS, and granted the defendants' motion in limine narrowing the issues to be tried.

The court allowed McKinney to proceed on two issues: whether he had a constitutional right to be housed in a smoke-free environment, and whether defendants were indifferent to his serious medical needs. Both before and during trial, McKinney sought to litigate the degree of his exposure to ETS and the actual and potential effects of such exposure on his health. The magistrate, however, excluded evidence that did not relate to McKinney's current medical symptoms, including documentation of the potential health effects of exposure to ETS.

After McKinney presented his evidence to a jury, the defendants moved for a directed verdict on the ground that McKinney failed to produce any evidence to support his claim that the defendants were deliberately indifferent to his serious medical symptoms. The magistrate granted the motion. The district court found that, as a matter of law, McKinney had no constitutional right to be free of secondary cigarette smoke. The magistrate framed the issue in all-or-nothing terms: either McKinney had a constitutional right to a completely smoke-free environment, or he had only a constitutional right to medical attention for proven serious medical needs. By so doing, the magistrate excluded a valid eighth amendment claim lying between these two extremes: that compelled exposure to levels of ETS that pose an unreasonable risk of harm to human health constitutes cruel and unusual punishment.

McKinney filed a notice of appeal[2] and requested that the government provide him with a transcript of the trial. The magistrate denied this request.

On appeal, McKinney raises the following arguments:

(1) that the magistrate erred in holding that, as a matter of law, compelled exposure to ETS does not violate a prisoner's constitutional rights;

(2) that the magistrate erred in holding that the Nevada anti-smoking statute does not apply to state prison libraries;

(3) that the magistrate erred in refusing to appoint an expert witness to testify about the health effects of exposure to ETS;

(4) that the magistrate erred in entering a directed verdict in favor of the defendants on the claim of deliberate indifference to serious medical symptoms; and

(5) that the magistrate erred in denying McKinney's request for production of a trial transcript at government expense.

## DISCUSSION

A. *Does a Prisoner Have a Constitutional Right to Be Free of Exposure to Levels of ETS that Pose an Unreasonable Risk of Harm to His Health?*

■ In her order granting defendants' motion for a directed verdict, the magistrate declared that there is no constitutional right for an inmate to be free from secondary cigarette smoke. The magistrate ruled that a prisoner can show a constitutional violation from involuntary exposure to ETS only by proving that the state was deliberately indifferent to his serious, immediate medical symptoms. We disagree. For the reasons that follow, we conclude that, even if an inmate cannot show that he suffers from serious, immediate medical symptoms caused by exposure

prison. The companies were never served with the complaint and have not made an appearance in the action.

**2.** The parties consented to have a United States Magistrate conduct the trial and order the entry of a final judgment. Under 28 U.S.C.

§ 636(c)(3), parties may appeal "directly to the appropriate United States court of appeals from the judgment of the magistrate in the same manner as an appeal from any other judgment of a district court." 28 U.S.C.A. § 636(c)(3) (West Supp.1990).

to ETS, compelled exposure to ETS is nonetheless cruel and unusual punishment if it is at such levels and under such circumstances as to pose an unreasonable risk of harm to an inmate's health.

 It is unquestioned that the Eighth Amendment's bar on cruel and unusual punishments proscribes more than just barbarous physical punishments. *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits penalties that transgress today's "broad and idealistic concepts of dignity, civilized standards, humanity, and decency...." *Id.* (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)). It is also undisputed that the conditions of confinement in a prison are subject to scrutiny under Eighth Amendment standards. *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). When the state takes a person into its custody, who by reason of the deprivation of his liberty cannot care for himself, the Constitution imposes upon the state a corresponding duty to assume responsibility for the prisoner's safety and well-being. *Estelle,* 429 U.S. at 103–104, 97 S.Ct. at 290–291; *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir.1985).

The Supreme Court in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), discussed the standard by which courts must examine an Eighth Amendment claim:

> No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. But such "'judgment[s] should be informed by objective factors to the maximum possible extent.'"

*Id.* at 346, 101 S.Ct. at 2399 (citations omitted). We must therefore determine, judging by objective factors and measured against our society's evolving standards of decency, whether it is cruel and unusual punishment to confine an inmate in a prison where he is exposed to levels of ETS that pose an unreasonable risk of harm to his health.

In this circuit, it is established that exposure to ETS by people who are sensitive to ETS because of pre-existing conditions may constitute cruel and unusual punishment. In *Franklin v. State of Oregon,* 662 F.2d 1337, 1346–47 (9th Cir.1981), we held that housing an inmate suffering from throat cancer with a smoker may violate the Eighth Amendment. We have not examined the question whether an inmate who is not suffering from a pre-existing condition may state a valid cause of action under the Eighth Amendment by alleging that continual involuntary exposure to ETS poses an unreasonable risk of harm to his health.

In *Avery v. Powell,* 695 F.Supp. 632 (D.N.H.1988), the district court declined to dismiss an Eighth Amendment claim based on exposure to ETS. The court first determined that, because widely accepted scientific evidence shows that ETS poses health hazards, unwanted exposure to ETS may be a punishment within the meaning of the Eighth Amendment. *Id.* at 639. The court then ruled that our society's attitudes have evolved to the point that unwanted exposure to ETS may amount to a violation of "society's evolving standards of decency." *Id.* at 639–40. The court noted that, as of 1987, forty-five states and the District of Columbia had enacted laws restricting smoking. *Id.* at 640. In addition, the court noted that the federal government has enacted laws and regulations aimed at reducing involuntary exposure to ETS on common carriers and in buildings that the government controls and operates, including federal prisons. *Id.*

In *Clemmons v. Bohannon,* 918 F.2d 858, *reh'g en banc granted,* 1990 WL 146949, 1990 U.S.App. LEXIS 20375 (10th Cir.1990), the Tenth Circuit agreed with *Avery* in holding that indefinite double-cell-

ing of smokers with nonsmokers against their expressed will can amount to a violation of the Eighth Amendment. The court in *Clemmons* stated that its ruling reflected "a longstanding judicial recognition that exposing a prisoner to an unreasonable risk of a debilitating or terminal disease does indeed offend [the] 'evolving standards of decency.'" 918 F.2d at 864.[3]

We agree with the reasoning in *Avery* and *Clemmons.* The following discussion explains that: (1) scientific evidence has rapidly accumulated in the last few years regarding the adverse health effects resulting from exposure to ETS; (2) the health consequences from exposure to ETS are magnified in prison settings because of the nearly constant exposure of inmates to elevated levels of ETS; (3) we have long recognized that conditions of confinement that threaten inmates' health and safety are unconstitutional; and (4) the attitude of our society has evolved to the point where, today, it indeed violates society's standards of decency to expose an unwilling inmate to levels of ETS that pose an unreasonable risk of harm to human health.

1. Scientific Evidence on ETS

■ In determining whether conditions of confinement are constitutional, "the court's judgment must be informed by cur-

rent and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners." *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir.1979).

It is beyond dispute that direct ingestion of tobacco smoke is harmful to health. The Surgeon General estimates that smoking is responsible for more than one of every six deaths in the United States.[4] More than 3800 compounds have been identified in cigarette smoke[5] and, of those, forty-three are carcinogenic.[6]

Mainstream cigarette smoke is the smoke that smokers draw directly into their mouths and lungs. ETS consists of the fraction of mainstream smoke that smokers exhale plus sidestream smoke, which burning cigarettes emit between puffs.[7] The chemical composition and the qualitative toxic and carcinogenic effects of ETS and mainstream smoke are similar, although the relative concentration of individual components may differ.[8]

Only recently have national public health agencies been able to draw firm conclusions regarding the health effects of exposure to ETS. In 1979, the Surgeon General reported that tobacco smoke can be a significant source of air pollution indoors.[9] Under conditions of heavy smoking and

---

**3.** *Gorman v. Moody,* 710 F.Supp. 1256 (N.D.Ind. 1989) is not to the contrary. In *Gorman,* the district court held that, even if it could be shown that ETS is harmful to non-smokers' health, the "'standards of decency that mark the progress of society'" have not evolved to the stage where the Eighth Amendment mandates a smoke-free environment in a prison setting. *Id.* at 1262. But as noted above, the right to an utterly smoke-free environment is not the real question. While the Constitution may not mandate a smoke-free environment, it does mandate an environment that does not expose inmates to a significant risk of harm to their health. Similarly, in *Caldwell v. Quinlan,* 729 F.Supp. 4 (D.D.C.1990), *aff'd,* 923 F.2d 200 (D.C.Cir.1990), the court held that a totally smoke-free environment was not required where prison authorities had already provided separate housing units and other facilities for non-smokers. *Id.* at 5–6. That conclusion is not inconsistent with our decision here.

**4.** U.S. Dep't of Health and Human Services, *Reducing the Health Consequences of Smoking:*

*25 Years of Progress, A Report of the Surgeon General* 11 (1989) (hereinafter "1989 Report").

**5.** National Research Counsel, *Environmental Tobacco Smoke: Measuring Exposures and Assessing Health Effects* 2 (1986) (hereinafter "NRC Report"). The report was prepared by the National Research Counsel in response to a request from two federal government agencies, the Office of Air and Radiation of the Environmental Protection Agency and the Office of Smoking and Health of the Department of Health and Human Services.

**6.** 1989 Report, at 12.

**7.** U.S. Dep't of Health and Human Services. *The Health Consequences of Involuntary Smoking, A Report of the Surgeon General* 7 (1986) (hereinafter "1986 Report").

**8.** *Id.* at 7–8.

**9.** U.S. Dep't of Health, Education, and Welfare, *Smoking and Health, A Report of the Surgeon General* ch. 11, at 32 (1979).

poor ventilation, the concentration of carbon monoxide level in the air may exceed the maximum limit for exposure during an eight-hour workday (fifty parts per million (ppm)).[10] Even with adequate ventilation, the concentration of atmospheric carbon monoxide may exceed nine ppm, the allowable ambient air quality limit set by the Environmental Protection Agency (EPA).[11]

In 1982 the Surgeon General reported that "[a]lthough the currently available evidence is not sufficient to conclude that passive or involuntary smoking causes lung cancer in nonsmokers, the evidence does raise concern about a possible serious public health problem."[12] The Surgeon General reported in 1984 that studies have found differences in measures of pulmonary function between subjects chronically exposed to ETS and those who were not.[13]

By 1986 the scientific evidence became strong enough for the Surgeon General to state conclusively that ETS causes nonsmokers to develop lung cancer:

> In examining a low-dose exposure to a known carcinogen, it is rare to have such an abundance of evidence on which to make a judgment, and given this abundance of evidence, a clear judgment can now be made: exposure to ETS is a cause of lung cancer. The data presented in this Report establish that a substantial number of the lung cancer deaths that occur among nonsmokers can be attributed to involuntary smoking.[14]

The 1986 Report also found that acute and chronic respiratory diseases have been linked to ETS.[15] In sum, the Surgeon General concluded, "[i]nvoluntary smoking is a

cause of disease, including cancer, in healthy nonsmokers."[16]

Concerning the critics of studies demonstrating the adverse health effects of ETS, the Surgeon General in the 1986 Report warned:

> Critics often express that more research is required, that certain studies are flawed, or that we should delay action until more conclusive proof is produced. As both a physician and a public health official, it is my judgment that the time for delay is past; measures to protect the public health are required now. The scientific case against involuntary smoking as a health risk is more than sufficient to justify appropriate remedial action, and the goal of any remedial action must be to protect the nonsmoker from environmental tobacco smoke.[17]

If the time for delay had passed by 1986, additional scientific evidence uncovered since then makes the Surgeon General's warning even more urgent in 1991.

A draft report released by the EPA concluded:[18]

> (1) ETS is causally associated with lung cancer in nonsmoking adults and that, according to EPA guidelines for carcinogen risk assessment, ETS is a Group A (known human) carcinogen; and

> (2) approximately 3800 lung cancer deaths per year among nonsmokers (never-smoker and former smokers) of both sexes in the United States are attributable to ETS.

55 Fed.Reg. 25,874 (1990).

The EPA classifies suspected human carcinogens into three groups. Group A con-

---

10. *Id.*

11. *Id.* at 21.

12. U.S. Dep't of Health and Human Services, *The Health Consequences of Smoking: Cancer, A Report of the Surgeon General* at 9 (1982).

13. U.S. Dep't of Health and Human Services, *The Health Consequences of Smoking: Chronic Obstructive Lung Disease, A Report of the Surgeon General* 405 (1984).

14. 1986 Report, at 10. The NRC Report, *supra* n. 5, also released in 1986, came to the same conclusion as the Surgeon General's report. It concluded that "[c]onsidering the evidence as a

whole, exposure to ETS increases the incidence of lung cancer in nonsmokers." *Id.* at 10.

15. 1986 Report, at 10.

16. *Id.* at 7.

17. 1986 Report, at xi-xii.

18. Environmental Protection Agency, *Health Effects of Passive Smoking; Assessment of Lung Cancer in Adults and Respiratory Disorders in Children; External Review Draft*, 55 Fed.Reg. 25,874 (1990). The announcement in the Federal Register states that the draft report was prepared pursuant to the Superfund Act. A final report is expected in the summer of 1991.

sists of known human carcinogens; Group B, probable human carcinogens; Group C, possible human carcinogens; Group D, agents that are unclassifiable as to human carcinogenicity; and Group E, agents that have shown evidence of non-carcinogenicity for humans.[19] Examples of Group A carcinogens are arsenic, asbestos, benzene, chromium compounds, and vinyl chloride.[20] If there were any doubt about the causative and quantitative link between lung cancer and ETS exposure, the EPA draft report firmly concludes that ETS is a definite and significant cause of lung cancer in humans.

### 2. Exposure to ETS in Prisons

The parties agree that two-thirds of the inmates at Carson City smoke.[21] The state does not dispute that McKinney is confined to a six-foot by eight-foot room with poor ventilation and that his roommate smokes five packs of cigarettes a day. The state also admits that, other than in the infirmary and the culinary, there is no restriction on smoking in the prison.

Unlike the general population, prisoners are not free to avoid or leave places where smoking is allowed. Prisoners cannot simply leave their cells when their cellmates decide to light up. In addition, because smoking is permitted virtually everywhere in the prison, and because it is undisputed that a clear majority of the prisoners are smokers, McKinney is almost constantly exposed to ETS at elevated levels. A reasonable factfinder could conclude that the adverse health effects associated with ETS exposure would be especially severe for McKinney.

### 3. Unconstitutional Conditions of Confinement

The court in *Gorman* reasoned that despite the scientific evidence that exposure to ETS is harmful to health, our society's standards of decency do not yet demand a smoke-free environment in a prison setting. *Gorman,* 710 F.Supp. at 1262. In our circuit, however, a finding that ETS endangers human health is sufficient to show an Eighth Amendment violation, even without a separate inquiry into society's evolving standards of decency. Our prior decision in *Hoptowit* clearly established that the Eighth Amendment's ban of cruel and unusual punishments prohibits conditions of confinement that pose unreasonable threats to inmates' health.

In *Hoptowit,* we held that "[p]ersons involuntarily confined by the state have a constitutional right to safe conditions of confinement." 753 F.2d at 784 (citing *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). While not every deviation from ideally safe conditions may amount to a constitutional violation, we ruled that conditions of confinement that seriously threaten the health and safety of the inmates are unconstitutional. *Id.* at 783–84.

Our prior cases demonstrate that the difference between constitutional and unconstitutional conditions of confinement can turn on the air that the prisoners breathe. In *Hoptowit,* we held that housing inmates in units with inadequate ventilation and air flow is unconstitutional. *Id.* at 784. In *Spain,* we held that denying prisoners fresh air and opportunities for regular outdoor exercise violates the Eighth Amendment. 600 F.2d at 199.

If making inmates breathe stagnant air is cruel and unusual punishment, it must be even more so to force inmates to breathe air containing levels of known human carcinogens sufficient to pose an unreasonable risk of harm to human health. It is hard to imagine that our society would tolerate exposing inmates to dangerous levels of any other Group A carcinogens, like benzene, asbestos or arsenic.

Poor air quality is not the only condition of confinement that may unconstitutionally

---

**19.** Environmental Protection Agency, *Methodology for Evaluating Potential Carcinogenicity in Support of Reportable Quantity Adjustments Pursuant to CERCLA Section 102* 13–16 (1988).

**20.** *Id.,* app. at 37–42.

**21.** Nationwide, the proportion of smokers in prisons is 90 percent. N.Y. Times, July 9, 1990 at A10, col. 5.

threaten the health and hygiene of prisoners. We have held that poor lighting, broken-down plumbing, unsanitary food handling, and polluted water can also violate prisoners' Eighth Amendment rights. *See Hoptowit,* 753 F.2d at 783; *Jackson v. Arizona,* 885 F.2d 639, 641 (9th Cir.1989). We have not waited until these conditions actually caused illness, but have mandated relief based on the risk these conditions entail. *See id.*

We draw additional support for our view from decisions in other circuits. *See Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985) (allegations of inadequate diet, unhealthy physical condition of the prison, denial of personal hygiene items, and the lack of sufficient opportunity to exercise each state a valid Eighth Amendment claim); *Ramos v. Lamm,* 639 F.2d 559, 567–72 (10th Cir.1980) (inadequate ventilation, obstructed plumbing system, and unsanitary living quarters are constitutionally impermissible); *Cunningham v. Jones,* 567 F.2d 653, 660 (6th Cir.1977) (improper diet for prisoners violates the Eighth Amendment); *Gates v. Collier,* 501 F.2d 1291, 1302 (5th Cir.1974) (holding that conditions of confinement that clearly threaten the health of the prisoners and substantially deprive them of basic elements of hygiene are unconstitutional).

Under *Hoptowit* and *Spain,* it is established that conditions in a prison that threaten a prisoner's health constitute cruel and unusual punishment. Scientific evidence is clear that exposure to ETS can have serious adverse health consequences. If housing nonsmokers and smokers in the same prison cell or allowing unrestricted smoking in other parts of the prison exposes nonsmoking inmates to a level of ETS that poses an unreasonable risk to their health, the Eighth Amendment is violated.

### 4. Evolving Standard of Decency

Thus, McKinney's claim may well fit within the boundaries of conditions of confinement that we have held unconstitutional because they pose unreasonable risks of harm to prisoners' health. In addition, we conclude that the attitude of our society has evolved at least to the point that it violates current standards of decency to expose unwilling prisoners to ETS levels that pose an unreasonable risk of harm to their health.

To determine the prevailing attitude of the society, we review the statutes and regulations that society has enacted.[22] As noted earlier in the discussion of *Avery,* as of 1987 forty-five states and the District of Columbia had enacted statutes restricting smoking in public places. *Avery,* 695 F.Supp. at 640. A significant percentage of the statutes were passed by lawmakers motivated by health concerns about exposure to ETS. *Id.* In fact, Nevada's anti-smoking statute,[23] which bans or restricts smoking in "public places," declares that the purpose of the statute is to restrict smoking to protect human health and safety. "The quality of air is declared to be affected with the public interest and [this statute is] enacted in the exercise of the police power of this state to protect the health, peace, safety and general welfare of its people." Nev.Rev.Stat. § 202.249 (1987). Other states' anti-smoking statutes contain similar language.[24]

At the federal level, smoking is banned on all domestic airline flights, except flights to and from Alaska and Hawaii. 49 U.S.C.A.App. § 1374(d) (West Supp.1990). Smoking is also restricted or prohibited in many places by regulations promulgated by federal agencies pursuant to their rulemaking authority. *See* 14 C.F.R. §§ 252.-1–.7 (1990) (regulation for restricting smoking on flights on which smoking is not otherwise banned); 41 C.F.R.

---

**22.** This approach is consistent with that taken in *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), in which both the plurality and the dissent relied on state statutes to determine the attitude of society regarding the appropriateness of death penalty for those who committed crimes while minors. *See also*

*Gorman,* 710 F.Supp. at 1261; *Avery,* 695 F.Supp. at 639 (citing *Thompson* ).

**23.** Nev.Rev.Stat. §§ 202.249–.2492 (1987).

**24.** *See Clemmons,* 918 F.2d at 866–67; *Avery,* 695 F.Supp. at 640.

§ 101–20.105–3 (1990) (regulations for controlling smoking in facilities owned by the General Services Administration); and 49 C.F.R. § 1061.1 (1988) (regulation for limiting smoking on interstate passenger carriers).

Most significantly, prisons and jails are beginning to take steps to restrict or ban smoking. A Federal Bureau of Prison regulation prohibits smoking in those areas of federal penitentiaries where "smoking would pose a hazard to health or safety" and allows the warden to designate smoking and non-smoking areas in other areas. 28 C.F.R. § 551.162 (1989). The American Jailers Association, which represents 6,500 jail administrators, passed a resolution endorsing bans on smoking by inmates.[25] As of May, 1990, county and state corrections departments in thirteen states have either banned or are considering banning smoking.[26]

At the local level, more than eighty cities and counties have enacted smoking laws since 1980.[27] The most comprehensive anti-smoking ordinance was passed in San Luis Obispo, California. The ordinance prohibits smoking in any indoor public area in San Luis Obispo, including all shops, restaurants, and bars.[28]

This review of legislation and regulations shows that society sees a need to protect non-smokers from involuntary exposure to ETS, which is increasingly regarded as a hazard to the health of non-smokers. Prohibition or restriction of smoking in jails and prisons across the country indicates that at least some states and the federal government have already recognized that inmates deserve protection from ETS.

5. Conclusion

We hold that McKinney has stated a valid Eighth Amendment claim for injunctive relief by alleging that his exposure to ETS in the prison is harmful to his health.

25. N.Y. Times, July 9, 1990 at A10, col. 5.

26. *Id.*

27. 1986 Report, at 324.

28. L.A. Times, August 2, 1990, at A3, col. 2.

This claim for injunctive relief is remanded to the district court for further proceedings consistent with this opinion.[29] McKinney should be allowed to present evidence regarding the level and degree of his exposure to ETS and whether that degree of exposure is sufficient to create an unreasonable risk of harm to his health. Because of the complexity of McKinney's case and the difficulty of gathering and presenting medical and technical evidence on the long-term effects of exposure to ETS, the district court should consider, on remand, appointing an attorney to represent McKinney.

6. Damages

Our holding that McKinney has stated a cause of action for injunctive relief does not automatically entitle him also to pursue his claim for damages. The defendants have raised the affirmative defense of qualified immunity, which shields them from liability for damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

 Officials pleading qualified immunity are liable for damages only if the contours of the right they are alleged to have violated are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). At the time the defendants acted, there was no clearly established liability for exposing prisoners to ETS. The defendants are therefore entitled as a matter of law to prevail on their defense of qualified immunity, and McKinney's claim for damages must fail.

29. This court does not have enough information about the conditions of the prison to decide what kind of separation of smokers and non-smokers would meet the constitutional standard.

B. *Does the Nevada Anti–Smoking Statute Apply to Prison Libraries?*

 McKinney argues that the Nevada anti-smoking statute [30] applies to prison libraries and that the defendants have violated his due process rights by failing to apply the statute to restrict smoking in the library. Prisoners claiming a due process violation under the Fourteenth Amendment must demonstrate that they have been deprived of a protected liberty or property interest by arbitrary government action. *Meachum v. Fano*, 427 U.S. 215, 226–27, 96 S.Ct. 2532, 2539–40, 49 L.Ed.2d 451 (1976). These interests may arise from the Constitution or statutes. *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7–11, 99 S.Ct. 2100, 2103–06, 60 L.Ed.2d 668 (1979).

In *Gorman*, the plaintiff argued that the Indiana anti-smoking law, which makes it illegal to smoke in public buildings except in designated smoking areas, applies to prison facilities. 710 F.Supp. at 1263. The court in *Gorman* held that the Indiana statute does not create a protected liberty interest for prisoners because the statute's definition of "public building" does not include prisons. *Id.* The Indiana statute defines "public building" as an enclosure or a part of an enclosure that "is occupied by any agency of state or local government" or is used as a public school or as a licensed health facility. *Id.*

The court in *Avery*, in contrast, found that the definition of "enclosed public places" in the anti-smoking legislation of New Hampshire does include prisons. 695 F.Supp. at 640. The New Hampshire law defines "enclosed public places" as " 'any enclosed, indoor area which is publicly owned or supported by tax revenues.' " *Id.* (quoting N.H.Rev.Stat.Ann. 155:45–53 (Equity Supp.1987)).

The Nevada statute does not define public places or buildings. Instead, it prohibits or limits smoking in certain specific public places, including any "[p]ublic elevator, library, museum, or a bus used by the general public, other than a chartered bus." Nev.Rev.Stat. § 202.2491.1(a) (1987). The Attorney General of Nevada interprets the provision to mean that the smoking law applies to all libraries, whether they be publicly or privately operated. 191 Nev. Op.Att'y Gen. 46, 47 (1975). If the Attorney General is correct, the statute should apply to prison law libraries as well.

In the absence of any decisional law interpreting the Nevada law, we believe that Nevada courts would find the attorney general's opinion persuasive. In addition, we fail to see why the public policy of the state of Nevada to protect the health of its people from ETS [31] should not apply within prison walls. Therefore, we hold that the Nevada anti-smoking statute applies to state prison law libraries. We further hold that the statute creates a liberty interest in smoke-free prison libraries that is protected by the due process clause. We reverse the magistrate's ruling and remand for further proceedings on this claim for injunctive relief.[32]

C. *Should the Magistrate Have Appointed an Expert Witness?*

 Important to McKinney's case would be the testimony of an environmental toxicologist regarding the health effects of exposure to ETS. Because he was unable to find an expert who would testify without a fee, McKinney requested that the district court appoint an expert witness at government expense under Fed.R.Evid. 706. The magistrate denied his requests.

 Under Rule 706, the court may on its own motion or on the motion of another party appoint an expert witness. Fed.R. Evid. 706(a). The expert so appointed is entitled to reasonable compensation as the court may allow, and in a civil case the compensation is "paid by the parties in

---

**30.** Nev.Rev.Stat. §§ 202.249–.2492 (1987).

**31.** Nev.Rev.Stat. § 202.249.

**32.** Because no court has previously held that the Nevada statute applies to prison libraries, the defendants have not violated clearly established law. Their valid claim to qualified immunity therefore precludes McKinney from proceeding with his claim for damages.

such proportion and at such time as the court directs, and thereafter charged in like manner as other costs," unless funds have been provided by law to pay the compensation. Fed.R.Evid. 706(b).

The magistrate found that because no funds have been provided by law to pay the compensation of an expert witness in civil rights cases, any expert appointed by the court must be paid by the parties. The magistrate then ruled that no expert may be appointed in the present case because McKinney, who proceeded in forma pauperis, would be unable to pay his proportion of the fees. The magistrate interpreted Rule 706(b) as allowing court-appointed experts only when *both* sides are able to pay their respective shares.

We believe that the magistrate's ruling was based upon an unduly restrictive reading of the rule. As we noted in *Students of Cal. School for the Blind v. Honig*, 736 F.2d 538, 549 (9th Cir.1984), "Rule 706 ... allows the court to assess the cost of the expert's compensation as it deems appropriate." We believe that the phrase "such proportion as the court directs," in an appropriate case, permits the district court to apportion all the cost to one side. Otherwise, we are faced with an inflexible rule that would prevent the district court from appointing an expert witness whenever one of the parties in an action is indigent, even when the expert would significantly help the court.

We hold that the district court does have the discretion to appoint an expert witness in this case and that McKinney is entitled to the benefit of the court's exercise of its discretion. Considering the complexity of the scientific evidence in the present case, we recommend that, on remand, the district court consider appointing an expert witness or witnesses who can provide the court with scientific information on the health effects of ETS and on the concentration levels of ETS in the Carson City prison.

**D. Did the District Court Err in Entering a Directed Verdict in Favor of the Defendants on McKinney's Deliberate Indifference Claim?**

 Our role in reviewing a directed verdict is the same as the district court's. *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1151 (9th Cir.1988). A directed verdict is proper if, without considering the "credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment ...." *Id.* (citation and internal quotation omitted).

 The magistrate allowed McKinney to go to trial before a jury on the issue of whether the defendants were deliberately indifferent to existing serious medical symptoms.[33] There is no evidence in the record to suggest that prison officials were deliberately indifferent to McKinney's existing medical symptoms. McKinney was examined by the prison doctor, who found no serious existing ailments requiring treatment. We therefore affirm the magistrate's ruling directing a verdict on the issue of defendants' deliberate indifference to McKinney's asserted medical symptoms.

**E. Did the District Court Err in Denying McKinney's Motion for Production of Trial Transcripts at Government Expense?**

 In appealing the decision of the district court, McKinney asked for the production of the trial record at government expense. Production of the transcript at government expense for an appellant in forma pauperis in a civil case is proper under 28 U.S.C. § 753 if a trial judge certifies that the appeal is not frivolous and presents a substantial question. 28 U.S. C.A. § 753(f) (West Supp.1990).

Of the issues raised by McKinney, the only one that requires the trial transcript is his claim that the district court erred in granting the directed verdict. The magis-

---

**33.** This issue, although also based on the Eighth Amendment, is different from the question whether prisoners are constitutionally entitled to be free from compelled exposure to levels of ETS that pose an as-yet-unrealized risk of harming their health.

trate denied McKinney's motion, holding that she was unable to certify that the appeal is not frivolous because she was unable to determine on what grounds McKinney was seeking to overturn the directed verdict. McKinney merely stated conclusorily in his motion that the trial court erred in granting defendants' motion for a directed verdict but failed to point to specific errors made by the magistrate in entering the directed verdict.

The relief under section 753 is permissive. Because the record does not indicate that the magistrate abused her discretion in denying McKinney's motion, we affirm the magistrate's ruling.

## CONCLUSION

We conclude that the Eighth Amendment forbids prison officials from housing McKinney in a prison environment that exposes him to levels of ETS that pose an unreasonable risk of harming his health. He has therefore stated a valid cause of action and may be entitled to injunctive relief. We reverse and remand this claim for further equitable proceedings, including a trial, if necessary, with the possible assistance of an attorney and an expert witness.[34] We also hold that Nevada's anti-smoking statute applies to prison libraries and remand McKinney's due process claim for further equitable proceedings. Although these claims for injunctive relief may proceed, McKinney's claims for money damages must fail because, in the circumstances of this case, state prison officials are entitled to qualified immunity as a matter of law. We affirm the magistrate's grant of a directed verdict on the issue of defendants' indifference to McKinney's immediate medical symptoms and also affirm her denial of McKinney's motion for a free trial transcript.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

**34.** Our decision to remand obviates the need to rule on whether the magistrate correctly granted the defendants' motion in limine.