John KAROLIS, Plaintiff,

v.

**NEW JERSEY DEPARTMENT OF CORRECTIONS, et al.,**
Defendants.

Civil Action No. 95–2241 (JEI).

United States District Court,
D. New Jersey.

July 19, 1996.

Jeffrey E. Fogel, Newark, NJ, for plaintiff.

Deborah T. Poritz, Attorney General of New Jersey by Andrew R. Sapolnick, Deputy Attorney General, Trenton, NJ, for defendant New Jersey Department of Corrections.

## AMENDED OPINION

IRENAS, District Judge:

Plaintiff John Karolis ("Karolis"), a New Jersey prison inmate, seeks an injunction declaring that he need not submit to the Mantoux tuberculosis ("TB") test, a subcutaneous injection which plaintiff claims violates the tenets of his Christian Science faith. Because preventing the spread of TB is a compelling state interest that cannot be met by a less restrictive means, the Court finds that neither the First Amendment nor the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1, prevents prison officials from administering the Mantoux test to plaintiff.

## I. PROCEDURAL HISTORY

On May 5, 1995, plaintiff sued the New Jersey Department of Corrections ("NJDC") and prison officials J. Russell Knight ("Knight"), Lance D. Meehan ("Meehan"), Robert D. Edmiston ("Edmiston"), Roland L. Hester ("Hester"), and John J. Rafferty ("Rafferty"). Citing RFRA and 42 U.S.C. § 1983, he alleged violation of his rights under the First Amendment Free Exercise Clause, the Fourteenth Amendment Due Process Clause, the New Jersey Constitution, and state regulations governing inmate discipline. Plaintiff also sought state law tort damages for negligent or intentional infliction of emotional distress.

The heart of the demanded relief is an injunction barring state prison officials from administering the Mantoux TB test and from punishing him for his refusal to submit to the test. He also sought compensatory damages, punitive damages, and reasonable attorney fees and costs. By Consent Order dated September 20, 1995, the parties agreed to dismiss the due process claims against NJDC, Edmiston and Meehan and all claims against NJDC for monetary relief.

On April 1, 1996, NJDC moved to dismiss the complaint arguing that it was entitled to Eleventh Amendment immunity. The Court denied the motion, finding that the RFRA clearly expressed a congressional intention to abrogate the states' usual Eleventh Amendment immunity from suit in federal court. *Karolis v. New Jersey Department of Corrections,* No. 95–2241 (D.N.J. May 6, 1996). The Court ordered the parties to submit affidavits identifying the type, invasiveness, effectiveness, expense, and ease of administration of TB testing currently used in the New Jersey prison system. The Court has received briefs and affidavits from both sides and now considers whether the case warrants summary judgment pursuant to Fed.R.Civ.P. 56.

## II. STATEMENT OF FACTS

The plaintiff, currently incarcerated at the Northern State Prison ("Northern State"), has been a Christian Science believer for approximately seventeen years. On May 11, 1993, while incarcerated at Southern State Correctional Facility ("Southern State"), plaintiff refused to submit to the Mantoux test, asserting that his religious beliefs opposed intrusive medical procedures. As required, Karolis signed a form titled "Refusal of Medical Treatment," and received a disciplinary charge for "refusal to cooperate in following a prescribed course of treatment." N.J.A.C. 10A:4–4.1.707. NJDC hearing officer Knight found Karolis guilty and imposed a seven day loss of privileges, despite plaintiff's assertion of his religious beliefs and his rights under N.J.A.C. 10A:16–5.1(a)(2).[1] On May 18, 1993, Karolis was summoned again for the Mantoux test, again refused and was again charged with the same prison infraction for his refusal. On June 15, 1993, NJDC hearing officer Meehan found plaintiff guilty and imposed another seven days loss of privileges.

Karolis appealed both hearing officer decisions to Edmiston, the Southern State Superintendent, citing his religious convictions and N.J.A.C. 10A:16.5.1(a)(2). Hester, Southern State's Assistant Superintendent, who was serving as Edmiston's designate, upheld the disciplinary charges. Plaintiff then appealed to Rafferty, Deputy Director of the Division of Operations of the Department of Corrections, who also upheld the hearing officer decisions and stated that inmates who refuse to submit themselves to the TB test "must be charged with .707 'refusal to cooperate in following a prescribed course of treatment.' " *DOC Control Policy* at III.B.2.(c).(2).

Plaintiff asserts that he was threatened with solitary confinement, administrative segregation, and loss of commutation time if he again refused the Mantoux test. Apparently succumbing to this threat, plaintiff agreed to the test, which found no evidence of TB.

On March 15, 1995, after plaintiff's transfer to Northern State, he was again asked to submit to the Mantoux test. Plaintiff again refused and was again threatened with solitary confinement and administrative segregation to induce compliance. The record does not indicate whether plaintiff took a TB test in 1995, but he filed this complaint on May 5, 1995.

Under current NJCD policy the Mantoux test is administered annually. *Lavietes Aff.* at ¶ 3. If a person tests positive or exhibits symptoms of TB (e.g. chronic cough, weight loss, hemoptysis[2]), prison medical personnel will administer a chest x-ray.[3] Lavietes Aff. at ¶ 4. An abnormal chest x-ray may be sufficient for a diagnosis of TB, or it may be confirmed by a sputum culture (saliva specimen) or a urine test. *Id.* All inmates with a positive Mantoux test and an abnormal chest x-ray are admitted to the St. Francis Medical Center and immediately placed in isolation. *DOC Control Policy* at III.B.1.(e).[4]

An inmate refusing medical treatment will be directly admitted to any facility which can provide respiratory isolation.[5] *Id.* This procedure is mandated under Chapter II of the State Sanitary Code. N.J.A.C. 8:57–1.1 to 1.12. If an inmate tests positive on the Mantoux test without a diagnosis of TB, the prison considers preventative therapy with

---

1. N.J.A.C. 10A:16–5.1(a)(2) provides that "[t]he express written consent of the inmate shall be required for . . . intrusive procedures."

2. Hemoptysis occurs when an individual evidences blood-stained sputum. It is often associated with infection in the lungs. *Dorland's Medical Dictionary* 750 (28th ed. 1994).

3. Dr. Dwight C. Hutchison, Director of Medical Services for the New Jersey Department of Corrections, indicated in his affidavit that an x-ray may only show signs of lung infection. Furthermore, an x-ray will only indicate "active" TB, but

not "dormant" TB. Ninety percent of those people who are actually infected with TB carry the "dormant" form. The "dormant" form is likely to become "active" in the future.

4. On December 1, 1992, the New Jersey Department of Corrections issued a memorandum entitled "Department of Corrections Tuberculosis Control and Surveillance Policy." We will refer to this document as "DOC Control Policy."

5. Respiratory isolation is achieved in a room equipped with negative air pressure flow. *DOC Control Policy* at III.B.1.(e).

isoniazid. *Lavietes Aff.* at ¶ 6. The prison does not administer isoniazid therapy to all inmates because it can cause liver dysfunction in older individuals. *Id.* Inmates who refuse the Mantoux test are charged with a disciplinary infraction. *DOC Control Policy* at III.B.2.(c).(2). There is no requirement that inmates with a positive reaction submit to preventative isoniazid therapy, nor is there a provision for charges or punishment for refusing to accept the medication. *See DOC Control Policy* at III.B.1.(d).

Plaintiff argues that there are other, less intrusive, procedures to effectively test for TB which do not violate the tenets of his religion. Plaintiff claims that some or all of the defendants are aware that alternatives exist and have failed to make any effort to accommodate his religious beliefs.

## III. DISCUSSION

### A. The Religious Freedom Restoration Act

Plaintiff seeks an Order pursuant to RFRA prohibiting defendants from punishing him because he refuses, on religious grounds, to submit to the Mantoux TB test. RFRA was adopted in 1993 in response to the Supreme Court's decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which altered the standard of review applied to cases where government activities burdened religious exercise. RFRA was passed to reinstate the compelling interest test for "striking sensible balances between religious liberty and competing prior governmental interest." 42 U.S.C. § 2000bb(a)(5). Section 2000bb–1(c) of RFRA provides that a "person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb–1(c). RFRA goes on to define "government" as a "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State." 42 U.S.C. § 2000bb–2(1).

RFRA provides in pertinent part that a government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability. 42 U.S.C. § 2000bb–1(a). However, a government may substantially burden a person's exercise of religion if it demonstrates that application of the burden to the person is: (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb–1(b).

### B. Substantial Burden

██ A plaintiff alleging a violation of RFRA must demonstrate that his right to the free exercise of religion has been substantially burdened. 42 U.S.C. § 2000bb–1(a). Here, plaintiff claims that the tenets of Christian Science forbid intrusive medical procedures. Christian Science believes in healing through prayer rather than conventional medical care. Janna C. Merrick, *Christian Science healing of Minor Children: Spiritual Exemption Statutes, and Fair Notice,* Issues in Law & Medicine, Dec. 22, 1994, at 2. It believes that even medicine's diagnostic tools undermine the authority of the Church. Larry May, *Challenging Medical Authority: The Refusal of Treatment by Christian Scientists,* 25 Hastings Center Report 1 (1995). According to the plaintiff, the Mantoux test is clearly an "intrusive medical procedure" which substantially burdens his religious beliefs.

The Supreme Court has decided that a substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *see Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (finding substantial burden where individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ..., on the other hand.") Here the State offers plaintiff the choice of either submitting to the Man-

toux test or suffering solitary confinement, administrative segregation, and loss of commutation time. This is precisely the type of choice which *Thomas* defines as creating a substantial burden on plaintiff's First Amendment free exercise rights.

### C. Compelling State Interest

■ Although plaintiff has demonstrated a substantial burden on his free exercise rights, this showing, standing alone, does not establish a RFRA violation. Any burden which furthers a compelling state interest and is the least restrictive means of furthering that interest will pass constitutional muster. Thus, the Court must determine whether New Jersey has a compelling state interest in administering the Mantoux Test to protect against the spread of TB in its prison system. We are convinced that it does.

■ A state has a strong interest in responding to the threat of any contagious disease by diagnosing and treating its inmates. *Boreland v. Superintendent Vaughn,* No. CIV.A. 92–0172, 1993 WL 62707, at *3 9306 (E.D.Pa. March 3, 1993); *accord Dunn v. White,* 880 F.2d 1188, 1195 (10th Cir.1989), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990). In fact, prison officials have an affirmative duty to protect inmates from infectious disease. *Jolly v. Coughlin,* 76 F.3d 468 (2nd Cir.1996). The Third Circuit Court of Appeals has even allowed prisoners a cause of action for mental anguish suffered as a result of exposure to TB. *Plummer v. United States,* 580 F.2d 72 (3rd Cir.1978). Other courts also have recognized that exposing inmates to contagious diseases might constitute a violation of their constitutional rights. *See e.g., Lareau v. Manson,* 507 F.Supp. 1177, 1194 (D.Conn.1980) (failure to screen prisoners for communicable disease violates constitutional rights of other prisoners), *aff'd in part* and *modified on other grounds,* 651 F.2d 96, 109 (2d Cir.1981).

TB, which is highly contagious, is spread through a bacterium called tubercle bacillus. *Hutchison Aff.* at ¶ 3; *Shilkret Aff.* at ¶ 2. TB is dispersed into the environment by droplet nuclei, which are airborne particles containing the TB bacterium. *Id.* Uninfect-

ed individuals become infected when they inhale the droplet nuclei that remain suspended in the air. When a person inhales the particles, TB bacteria settle in the lungs and multiply. *Hutchison Aff.* at ¶ 4; *Shilkret Aff.* at ¶ 3. Once the lungs are infected, the bacteria may move through the blood stream and infect the kidneys, spine, and even the brain. *Shilkret Aff.* at ¶ 3. The nuclei are transmitted when an infected individual sneezes, coughs, or speaks. *Hutchison Aff.* at ¶ 3; *Shilkret Aff.* at ¶ 2.

There are several factors which influence TB's communicability: (1) the concentration of viable organisms in the droplet nuclei; (2) the susceptibility of the potential host; and (3) the length of time an individual is exposed to the contaminated air. Rosemary G. Reilly, *Combating The TB Epidemic: The Legality of Coercive Treatment Measures,* 27 Colum.J.L. & Soc.Probs. 101, 104 (1993). Infection, however, does not indicate active TB. *Id.* at 105. Once the bacterium enter the lungs, they are able to multiply until the body's immune system overcomes the infection. *Id.* The bacterium may remain dormant for a lifetime, and a person who only carries dormant TB cannot spread it to others. However, those who carry TB are at risk of active TB later in life. *Austin v. Pa. Dept. of Corrections,* No. CIV.A. 90–7497, 1992 WL 277511 at *2 (E.D.Pa. Sept 29, 1992); *Shilkret Aff.* at ¶ 5.

The likelihood of developing active TB increases if the individual's immune system is weakened. United Hospital Fund, *The TB Revival: Individual Rights and Societal Obligations in a Time of AIDS,* 5 (1992). In prison, where a higher proportion of people in a closed setting carry HIV, the spread of TB nuclei is more prevalent. *Shilkret Aff.* at ¶ 5.

Furthermore, TB is now a more serious threat than it was in the past. New strains of TB have emerged that are resistant to standard treatments. Cynthia A. Carlon, *TB Control: Will Our Legal System Guard Our Health And Will The ADA Hamper Our Control Efforts?,* 13 J.Legal Med. 563, 566 (1992). The new strains, called Multidrug Resistant TB, develop when infected patients

begin their medications, killing off the weaker strains of TB, but then fail to continue with their prescribed medications. *Id.* The multidrug resistant strains are easily spread when the dormant TB becomes active. *Id.* These new TB strains resulted in 39,000 more TB cases than would have been expected between 1985 and 1991. *Id.* at 563.

While TB can be transmitted without any intimate or physical contact, limited exposure is usually insufficient for transmission. Reilly, *supra* at 105. A continuous respiratory exposure to an individual with active TB is necessary for the disease to spread to another individual. *Id.* Thus, a confined prison setting is precisely the type of environment where TB is likely to spread easily and rapidly. *Hutchison Aff.* at ¶ 4; *Shilkret Aff.* at ¶ 5.

The evidence submitted by the defendants verifies the well-documented medical view that TB is a very serious disease that can sometimes be fatal. Dr. Hutchison, Director of Medical Services for the New Jersey Department of Corrections, has indicated that an individual infected with TB in a congregate living arrangement, such as a prison, puts prisoners, custody staff and health employees at risk. *Hutchison Aff.* at ¶ 4. Mr. Shilkret, the TB Control Program Chief for the New Jersey Department of Health, reached the same conclusion. *Shilkret Aff.* at ¶ 4. Although Dr. Lavietes, an Associate Professor of Medicine in the pulmonary division of the New Jersey Medical School, has declared that only about eight percent of those who test positive on the Mantoux test develop active TB, this figure is higher in a prison setting, where people live in close quarters and where a higher proportion of the population is HIV positive. *Shilkret Aff.* at ¶ 5.

Given the increase in the number of reported cases of active TB in recent years, the severity of active TB, the increased risk in a prison setting and the possibility of additional complications where the patient is infected with HIV, the Court concludes that there is a compelling state interest in preventing the spread of TB in its prisons by detection at the earliest possible opportunity. This goal is easily achieved through the administration of the Mantoux test.

## D. Least Restrictive Means

■ Although we have concluded that the defendants' administration of the Mantoux test furthers a compelling state interest, the defendants must still show that the Mantoux test is the least restrictive means of furthering that interest. We conclude that it is. Although Plaintiff argues that subjecting him to an annual x-ray or providing periodic sputum samples would be an alternative and equally effective means of monitoring for TB, we are unpersuaded that monitoring for active TB satisfies the prison's goal of detecting latent TB infections.

The Centers for Disease Control ("CDC") has identified three sequential steps which are necessary for containing and controlling TB: (1) identification of infected individuals; (2) isolation of contagious patients; and (3) treatment through the use of medication. Carlon, *supra* at 570. Since the Mantoux test is diagnostic, designed only to identify those individuals who are infected with TB, the Court observes that step one of the CDC's process is the only measure at issue here.

The Mantoux test is the most effective method of determining whether a person is infected with TB.[6] Centers for Disease Control, *Control of TB in Correctional Facilities: A Guide for Health Workers* (1992) at 5; *Hutchison Aff.* at ¶ 12; *Shilkret Aff.* at ¶ 10. The test requires an injection of a purified protein derivative (PPD) under the skin of the forearm. *CDC Control Guide* at 5. The injection sight is examined within forty-eight to seventy-two hours for signs of a reaction.

---

**6.** The Court observes, however, that the Mantoux test results in "false positives" in two percent of the cases, and in "false negatives" in up to ten percent of the cases. However, the "false negatives" occur mainly in individuals with weakened immune systems. This would include those who are HIV-positive or individuals who have developed AIDS. The injection of protein involved in the TB test may not trigger a sufficient immune response to generate a skin reaction. Nonetheless, prisons can obtain medically significant information from the inmates' submission to the test. *Jolly,* 76 F.3d at 478.

*Id.* A reaction to PPD manifests itself in the form of hardness (induration). *Shilkret Aff.* at ¶ 6. Individuals without induration and/or induration measuring less than ten millimeters are considered negative. *Id.* Individuals with induration measuring ten millimeters or higher are considered positive. *Id.* However, those who reveal an induration of five millimeters or more are considered positive if they have HIV infection, abnormal chest x-rays and/or contacts with an active case of TB. *Id.*

A positive reaction to the Mantoux test indicates that the person has been exposed to TB. *Hutchison Aff.* at ¶ 7; *Shilkret Aff.* at ¶ 7. Additional medical examinations, including chest x-rays, are required for anyone who tests positive after the Mantoux test. *Id.*

The plaintiff's expert, Dr. Lavietes, claims that one alternative method used to detect TB is a chest x-ray.[7] *Lavietes Aff.* at ¶ 7. Mr. Shilkret, however, has indicated that an x-ray will identify only those patients with "active" TB, and that an x-ray is usually administered when patients have already reacted positively to the Mantoux test. *Shilkret Aff.* at ¶ 8. Furthermore, both Dr. Hutchison and Mr. Shilkret caution that an x-ray alone is no substitute for the Mantoux test. *Hutchison Aff.* at ¶ 9; *Shilkret Aff.* at ¶ 8. While the Mantoux test will indicate dormant TB, a chest x-ray will only show signs of active TB. *Id.* This distinction is critical. By the time an x-ray shows signs of TB, the infected individual may have been spreading the disease to other inmates, whereas a positive Mantoux test would trigger preventative therapy. *Hutchison Aff.* at ¶ 7.

The proper treatment for a positive reaction to the Mantoux test is isoniazid ("INH") therapy. *Hutchison Aff.* at ¶ 8; *Laveites Aff.* at ¶ 6. A possible course of action would be to treat plaintiff as if he had a positive reaction to the Mantoux test and to administer the INH therapy. However, plaintiff is in his sixties and at risk of harmful side effects to such treatment. INH is inappropriate for older individuals because it can cause liver dysfunction. *Hutchison Aff.* at ¶ 8; *Lavietes Aff.* at ¶ 6. Dr. Hutchison has

recognized that INH therapy would be medically unsound for plaintiff because he is serving a life term, which would require INH therapy every year for six to twelve months. Even one treatment of INH could cause liver damage. *Hutchison Aff.* at ¶ 11.

Chest x-rays alone are insufficient to serve New Jersey's compelling interest in detecting TB among its inmates at the earliest possible moment. Repeated X-rays are incapable of detecting dormant TB and would unnecessarily expose plaintiff to radiation on a continual basis. Similarly, INH therapy is so invasive that it could unnecessarily cause the plaintiff liver damage. Dr. Hutchison has indicated that the Mantoux test is currently the world-wide standard for screening populations for TB infection. The combination of a positive Mantoux test and a chest x-ray leads to the earliest possible detection and treatment of the individual who, with undetected TB infection, could transmit the disease to others long before the disease reveals itself in an x-ray. Surely the Mantoux test is a less restrictive means of TB detection than using INH therapy to treat an infection that may not even exist.

## IV. REFUSAL OF TREATMENT

The plaintiff asserts that punishment for his refusal to submit to the Mantoux does not further a compelling state interest. He argues that even if he were to submit to the test and test positive, he would not be required to take the medication. Accordingly, plaintiff contends that the state has failed to demonstrate how one refusal would affect its ability to conduct an effective TB tracking program. We disagree.

The record shows that inmates who refuse annual TB testing are in violation of NJDC policy and are referred to the Department of Health or NJDC medical staff and counseled on the general reasons for compliance with TB testing. *DOC Control Policy* at III. B.2.(c). If still not compliant, they must be charged with .707 Refusal to Cooperate in Prescribed Course of Treatment. *Id.* Inmates who fail to submit to the test at this

---

7. The record indicates that plaintiff does not object to an x-ray.

point may be placed in respiratory isolation at St. Francis Medical Center. *Id.*

Here, plaintiff appears to seek the result achieved in *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996). In *Jolly,* the plaintiff was a Rastafarian incarcerated at the Attica Correctional Facility in New York. *Id.* at 471. He refused to submit to the Mantoux TB test, claiming that his religious beliefs would not permit administration of the test. *Id.* The control policy of the New York State Department of Correctional Services required all inmates who refused the screening test to be placed in "medical keeplock," and accordingly, the plaintiff was segregated. *Id.* However, "medical keeplock" had no actual medical significance. *Jolly,* 76 F.3d at 471. Those who refused to submit to the Mantoux test for latent TB would continue to share the same breathing space as other inmates. *Id.* Unlike inmates with "active" TB, the plaintiff was not placed in "respiratory isolation." *Id.* It was the prison's policy that inmates who took the screening test and were found to carry latent TB would not be placed in either medical keeplock or respiratory isolation. *Id.* The Court of Appeals found that the prison offered no basis for concluding that the plaintiff's continued confinement in an unisolated yet segregated area would serve the compelling interests in administering an effective TB screening program. *Jolly,* 76 F.3d at 479.

The Court recognizes two crucial distinctions between *Jolly* and the instant case. First, in *Jolly,* the plaintiff was placed in medical keeplock indefinitely. *Jolly,* 76 F.3d at 472. He remained in medical keeplock for three and one-half years, except for weekly ten-minute showers, and he filed his complaint to seek release, claiming that the conditions of his confinement were causing him to suffer from headaches, hair loss, rashes, and an inability to stand or walk without difficulty. *Id.* In the instant case, the record shows that plaintiff was not confined to administrative segregation, but did lose privileges twice, for seven days on each occasion. Plaintiff is not seeking an injunction for release from administrative segregation, but rather an injunction which would prevent future segregation.

In *Jolly* the confinement used to compel compliance offered no medical protection. NJDC, by way of contrast, has clearly indicated that any inmate who persists in refusing the TB screening test will be placed in respiratory isolation. Therefore, although the threat of confinement is calculated to produce compliance with prison policy, it also serves the penological interest of preserving the health of inmates and prison employees.

## V. REMAINING CLAIMS

■ Plaintiff also alleges that defendants have directly infringed his free exercise rights under the First Amendment and have thus violated 42 U.S.C. § 1983. While free exercise claims brought by prison inmates under RFRA are subject to the strict compelling interest test, free exercise claims brought outside RFRA are subject only to a "reasonableness" test. *Jolly,* 76 F.3d at 475; *see O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349–50, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987) (concluding that regulation burdening prison inmate's free exercise right need only be "reasonably related" to legitimate penological interests). If the State meets the RFRA standards in requiring the Mantoux test, then it clearly meets the "reasonably related" standard.

Plaintiff's other claims arise under state law. Since our dismissal of the First Amendment and RFRA claims resolves all matters on which federal jurisdiction is based, we will dismiss the remaining claims without prejudice. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## VI. CONCLUSION

The purpose of administering the Mantoux test is to detect TB infection. The record before the Court leaves no doubt that TB is a highly contagious disease that is likely to have devastating and far-reaching effects, unless the infection is held in check by an aggressive tracking program. The Center for Disease Control considers the Mantoux test the most effective method of detecting TB in its latent form. We recognize that latent TB does not pose an immediate health risk to anyone. But, an "immediate" health risk should not be confused with "no" health

risk. When left untreated, the dormant form of TB can become active, especially in a prison setting where the inmates' immune systems are the natural targets of a host of infections that include venereal disease, HIV and AIDS. What separates TB from other common viruses that proliferate in prisons is that physical contact is not required to contract the infection. A prisoner need only inhale a floating tubercle particle. Accordingly, the New Jersey Department of Corrections has included diagnostic testing via the Mantoux test in its routine program for controlling disease.

■ It is a well-established principle that federal courts should not second-guess prison regulations that might impinge on an inmates' constitutional rights when the regulations are reasonably related to penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *see Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977) (recognizing that if prison administrators are to make difficult judgements concerning institutional operations, then such a deferential standard is necessary); *see also Lewis v. Casey*, —— U.S. ——, ——, 116 S.Ct. 2174, 2185, 135 L.Ed.2d 606 (1996); *see also Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) (observing that prison authorities are best equipped to make difficult decisions regarding prison administration).

Here, the NJDC's TB tracking program is designed to preserve the plaintiff's health, as well as the health of other inmates and prison employees. The impact of accommodating plaintiff's right to refuse screening for TB could be devastating to plaintiff as well as innocent third parties. Involuntary medical testing is authorized by statute in many circumstances, "most notably when a person may be driving under the influence of intoxicating drugs or alcohol." Carlon, *supra* at 577. Public health and safety are the bases for legislation allowing drug and alcohol testing for drivers. *Id.* Public health is similarly the motivating force behind the TB screening programs. TB infection may not be as immediate or as sensational as an auto accident; it can be just as deadly.

Although Plaintiff has shown that he is substantially burdened by administration of the Mantoux test, the Court finds that New Jersey has a compelling interest in performing the test. When compared with the only effective alternative, the Mantoux test is in fact the least restrictive means of detecting TB. Summary Judgment will be granted to the defendants on all federal claims asserted by plaintiff. An appropriate order will be entered.