Moises MALDONADO, Plaintiff,

v.

Jack TERHUNE, Scott Faunce,
Correctional Medical Services,
Inc., Defendants.

No. CIV. A. 98–3327 (JEI).

United States District Court,
D. New Jersey.

Dec. 4, 1998.

Moises Maldonado, Leesburg, NJ, Plaintiff *pro se.*

Peter Verniero, Attorney General of New Jersey by Marianne Legato, Deputy Attorney General, R.J. Hughes Justice Complex, Trenton, NJ, for Defendants.

Lally, Holtzman, Gillihan, Duffin & Quasti, P.C. by Stephen D. Holtzman, Vanessa P. Patrizi, Linqood, NJ, for Defendants.

## OPINION

IRENAS, District Judge.

Plaintiff, Moises Maldonado ("Maldonado"), filed a complaint on June 5, 1998, challenging the medical treatment he has received while incarcerated in Bayside State Prison ("Bayside"). Maldonado seeks recovery of damages pursuant to 42 U.S.C. § 1983, alleging that the lack of frequent testing for tuberculosis and the defendants' deliberate indifference to the potential adverse side effects from his treatment violate his constitutional right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. Defendants' filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. Be-

cause plaintiff has failed to allege facts to support a deliberate indifference claim under § 1983, defendants' motion to dismiss will be granted and plaintiff's complaint will be dismissed in its entirety. Plaintiff's request to bring this claim as a class action is denied.

## I

Plaintiff, Moises Maldonado, tested positive for the presence of tuberculosis infection during his current incarceration in Bayside. Plaintiff alleges that he had prior negative tests on July 30, 1995 and again in July of 1996 while in the Cape May County Jail. After being transferred to Bayside he again tested negative on March 7, 1997. On March 18, 1998, plaintiff was again tested, but this time the result was positive. Maldonado alleges that, within a week of his positive test results, Correctional Medical Services ("CMS") performed additional examinations and tests to determine the appropriate treatment, including an examination of plaintiff's liver, chest x-rays and several blood tests. Prior to issuing any medication, CMS administered an additional tuberculosis test which confirmed the positive result.

The defendant was given several types of medication and it was explained to him that he would be taking this medication for a period of six months. The defendant maintains that on July 2, 1997, he was told, by an unnamed source, that the medication he was taking "has been found to have serious side effects and that it was damaging" his liver. (Complaint at p. 8.) Petitioner asserts that he was notified, again by an unnamed source, that his medication would be changed, but that as of the filing of the complaint he was still being given the same medicine.

The gravamen of plaintiff's complaint is that testing should be done every six months, rather than yearly, and that his medication should be changed because one of its possible side effects is liver damage.

## II

To understand the complaint a basic understanding of tuberculosis and the response of the New Jersey Department of Corrections to its threat is required. Most of this basic background is set forth in some detail in *Karolis v. New Jersey Department of Corrections,* 935 F.Supp. 523 (D.N.J.1996).[1] The Department of Corrections on December 1, 1992, adopted a comprehensive plan to deal with the hazards of tuberculosis contained in a lengthy memorandum entitled "Department of Corrections Tuberculosis Control and Surveillance Policy" (referred to hereafter as *"DOC Control Policy"*).

The heart of the *DOC Control Policy* is the administration of the Mantoux test to all prisoners upon their arrival at a state facility and the testing of all prisoners and DOC employees on a yearly basis. This test is described in *Karolis,* 935 F.Supp. at pp. 528–529. A positive test result, however, does not necessarily mean that the patient has an active case of tuberculosis. There are five tuberculosis classifications ranging from TB0 (no exposure, no infection) through TB5 (possible tuberculosis, status unknown ['rule out' TB]). TB2 describes people who have tested positive but are asymptomatic (latent infection, no disease). Individuals showing actual symptoms are characterized as having active tuberculosis, TB3. *See Chaisson,* at < http://hopkins-id.edu/diseases/tb/tb——class. html >. It is not clear from the complaint whether plaintiff is TB2 or TB3.

A prisoner who tests positive is then subject to additional tests for the purpose of determining whether the disease is active and to determine what treatment, if any, is appropriate. For those determined to be TB2 a decision must be made whether to begin prophylactic therapy:

Isoniazid preventive therapy is the preferred approach for prophylaxis against tuberculosis in the United States. Individuals who are candidates for preventive therapy are those with positive tuberculin

---

1. A technical, but comprehensive, article on tuberculosis has been written by Richard E. Chaisson, M.D. and published on the internet by the Johns Hopkins University Division of Infectious Diseases. This article will be hereafter referred

to as *Chaisson.* It can be accessed on the Internet at Chaisson, *Tuberculosis* (visited Dec. 4, 1999) http://hopkins-id.edu/diseases/tb/index_tb.html.

skin tests and risk factors for tuberculosis or individuals exposed to tuberculosis in an infectious case who are at high risk of acquiring infection and disease. *Chaisson,* at < ... /tb_proph.html>.

There are five categories of individuals for whom Isoniazid treatment is recommended. Plaintiff clearly falls into two of those classes: Individuals under the age of 35 [2] in areas of TB prevalence (plaintiff alleges, correctly, that prisons fit into this category) and persons who may be in close contact with others known or suspected to have TB. Other categories of persons for whom preventative therapy is recommended are drug users, those who are HIV positive and those with a variety of other medical risk factors (Silicosis, 10% underweight, chronic renal failure, diabetes, etc.). *Chaisson,* Figure 8 at < ... /tb_fig8.html>. The significance of age 35 is that a possible Isoniazid side effect, liver damage, is more prevalent in persons over 35 than under that age:

> The most common drug side effect during therapy for tuberculosis is hepatotoxicity. Isoniazid, rifampin and pyrazinamide [the three most common TB drugs] are all hepatotoxic, though adverse reactions are more common with isoniazid. Baseline liver function tests should be obtained for all patients beginning treatment, and monthly monitoring is recommended for patients with baseline abnormalities or concomitant liver disease. Clinical monitoring is appropriate for all other patients. When evidence of hepatitis develops, all drugs should be stopped until signs and symptoms resolve or improve. Patients should then be rechallenged sequentially with each drug in the regimen and monitored for recurrence. *Chaisson,* at < ... /tb_treat.html>.[3]

The New Jersey Department of Corrections has responded vigorously to the tuberculosis threat. Its *DOC Control Policy* is in complete conformance with good medical practice, providing for annual testing, prompt treatment and, where necessary, isolation of infected prisoners to prevent further spread of the disease. *See Karolis,* 935 F.Supp. at 525–526. Interestingly, the policy applies not only to prisoners, but to DOC employees who work in the prisons. Thus, like inmates, employees are required to be tested annually. *DOC Control Policy* III C.

Prisoners and employees who refuse annual testing are subject to disciplinary action. *DOC Control Policy* III B.2(c), III C.1(c). All inmates who test positive are offered appropriate therapy, after further testing. The nature of the treatment depends on whether the patient is asymptomatic or has active tuberculosis. *DOC Control Policy* III B.1(d)-(f). There does not appear to be any disciplinary action taken against an inmate who refuses treatment (*See Karolis,* 935 F.Supp. at 526; *DOC Control Policy* III B.1(d); *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)), but the State may seek a court order for treatment or place the prisoner in isolation. *DOC Control Policy* III B.2.(c). There is no suggestion that plaintiff ever refused treatment.

Plaintiff's own complaint suggests that in his case the DOC followed its own polices in terms of testing and treatment and responded promptly to his positive Mantoux test. Indeed, it is clear from the petition that prison doctors were monitoring his liver function, and it is from those doctors that he allegedly learned there may be a problem. Interestingly, the complaint alleges that he was told about the side effects of his treatment on July 2, 1998. However, that same complaint is signed and dated June 5, 1998, although it was not postmarked until July 13, 1998. Thus, the liver damage issue appears to have been an afterthought to the original complaint.

**2.** Defendant has advised the court that plaintiff is 32 years of age.

**3.** There are a variety of other antituberculosis drugs available which are generally used when the first line drugs of choice do not work. *See Chaisson,* table 5 at < ... /tb_treat.html>. Although these drugs do not have liver damage as a possible side effect, they do have other severe possible adverse reactions. Indeed, Chaisson notes that "These drugs are more difficult to use than [the Isoniazid et al.]. They should be used only when necessary ..." *Chaisson,* at < ... /tb_treat.html>.

## III

Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept the allegations of the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Although the court must assume as true all facts alleged, "[i]t is not … proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Also, when "[c]onfronted with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

It is recognized that *pro se* submissions "must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972); *Gillespie v. Crawford*, 833 F.2d 47, 49 (5th Cir.1987), *on reh'g*, 858 F.2d 1101 (5th Cir. 1988) (en banc). When reviewing a *pro se* complaint, a court must assume plaintiff's factual allegations to be true and construe his claim liberally. *Neitzke v. Williams*, 490 U.S. 319, 330 n. 9, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Roman v. Jeffes*, 904 F.2d 192, 197 (3d Cir.1990).

## IV

■ Although Maldonado failed to seek class certification under Federal Rule of Civil Procedure 23, his complaint and his request that all inmates be tested twice a year clearly informs this Court of his desire to bring this § 1983 action on behalf of other inmates. Pursuant to Rule 23, the representative party must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Because of the skepticism of a pro se litigant to adequately represent his own rights, Courts should hesitate to allow a lay person to risk the rights of others. *See Avery v. Powell*, 695 F.Supp. 632, 643 ("pro se plaintiff may not possess the knowledge and experience necessary to protect the interests of the class as required by Rule 23(a)(4)").

■ When confronting such a request from a prisoner, Courts have consistently held that a prisoner acting pro se "is inadequate to represent the interests of his fellow inmates in a class action." *Caputo v. Fauver*, 800 F.Supp. 168 (D.N.J.1992); *see, e.g., Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir.1975) ("it is plain error to permit this imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action"); *Ethnic Awareness Org. v. Gagnon*, 568 F.Supp. 1186, 1187 (E.D.Wis. 1983) (holding that president of association of minority prisoners would not fairly and adequately protect interests of class even though intelligent enough to represent himself). Accordingly, Maldonado's request to represent the class is denied and this Court will evaluate only his individual claim.

## V

In the complaint, plaintiff names three defendants, Correctional Medical Services, Scott Faunce, an administrator of the Bayside Prison, and Jack Terhune, the commissioner of the New Jersey Department of Corrections. Since the complaint fails to allege facts sufficient to support a § 1983 claim under the Eighth Amendment, this Court grants the defendants' motion to dismiss.

### A

■ Section 1983 provides for the imposition of liability on any person who, acting

under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To assert a claim successfully under § 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person "acting under color of State law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Shaw v. Strackhouse,* 920 F.2d 1135, 1142 (3d Cir.1990); *McArdle v. Tronetti,* 769 F.Supp. 188 (E.D.Pa.1991), *aff'd,* 961 F.2d 1083 (3d Cir. 1992). In addition, the Third Circuit requires that § 1983 claims be pled with a "modicum of factual specificity ... identifying the particular conduct of the defendants that is alleged to have harmed the plaintiffs." *Ross v. Meagan,* 638 F.2d 646, 650 (3d Cir. 1981); *Darr v. Wolfe,* 767 F.2d 79, 80 (3d Cir.1985).

**B**

■ Plaintiff's complaint alleges that he received unsatisfactory care from medical and prison staff at Bayside, both for their inadequate tuberculosis testing procedures and for their failure to change his medication despite its serious side effects. The Eighth Amendment provides a constitutional basis for a § 1983 claim by prisoners alleging inadequate medical care. However, "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation [of the Eighth Amendment] under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Township of Manalapan,* 47 F.3d 628, 636–37 (3d Cir. 1995).

■ In order to support a claim, the inadequacy of the medical care must be evidenced by "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S.

97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also U.S. ex rel. Walker v. Fayette County,* 599 F.2d 573, 575 (3d Cir.1979). Deliberate indifference may only be found where there has been an unnecessary and wanton infliction of pain. *See Estelle,* 429 U.S. at 104, 97 S.Ct. 285. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend the "evolving standards of decency" in violation of the Eighth Amendment. *Id.* 429 U.S. at 105–06, 97 S.Ct. 285.

■ The "deliberate indifference" standard is, in effect, a two-pronged test, requiring both that there be deliberate indifference on the part of prison officials and that the prisoner's medical needs be serious. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979); *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). A mere disagreement with the form of treatment does not rise to a constitutional violation. *See Estelle,* 429 U.S. at 107, 97 S.Ct. 285. Moreover, medical malpractice, even if it did occur, does not become a constitutional claim merely because the victim is a prisoner. *Id.* 429 U.S. at 106, 97 S.Ct. 285.

■ A medical need is serious "if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Pace v. Fauver,* 479 F.Supp. 456, 458 (D.N.J.1979), *aff'd,* 649 F.2d 860 (3d Cir.1981). Medical needs may also be serious "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss." *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). In applying this test, a court should consider such factors as the severity of the medical problems, the potential for harm if the medical care is denied or delayed and whether any such harm actually resulted from the lack of medical attention. *See Burns v. Head Jailor of*

*LaSalle County Jail,* 576 F.Supp. 618, 620 (N.D.Ill.1984).

## C

Maldonado claims that he had contracted tuberculosis at Bayside. Active tuberculosis is surely a "serious medical need," *Estelle,* 429 U.S. at 104, 97 S.Ct. 285, and even the latent presence of the tuberculosis bacterium, as shown in a positive Mantoux test, is a condition which must be treated with the utmost care and caution. As a general rule, it is not required that latent health problems blossom into full fledged disease before being considered serious.

Even though the court finds that plaintiff's needs were serious, it is obvious, even from the facts alleged in the complaint, that prison officials were not deliberately indifferent to those needs. Maldonado himself states that prison officials tested him once a year for tuberculosis and provided further medical examinations and treatment within the week of his positive result. Moreover, this treatment was in conformity with generally accepted medical practice. He was provided the drug of choice for treatment of tuberculosis and monitored regularly to be on the lookout for side effects. Indeed, the detailed and lengthy *DOC Control Policy* adopted in 1992 bespeaks a serious and concerted effort by state officials to deal with the tuberculosis threat.

Notwithstanding these examinations, Maldonado claims that inmates should be tested twice a year instead of once a year because of the "emergency situation" at the prison and the threat that the disease could spread to the entire population. (*See* Moises Maldonado's letter to Charles Leone, Assistant Superintendent, dated May 11, 1998.) There is no suggestion that more frequent testing of plaintiff would have had an impact on the fact or timing of his (or anybody else's) testing positive for or contracting tuberculosis. That prison employees, like prisoners, are also tested yearly hardly suggests deliberate indifference. It is not the job of this Court to second guess the decisions of the prison administrators and physicians. This Court is only required to make sure that such decisions were reasonable responses to the known danger.

Active tuberculosis will be easily diagnosed by x-ray, sputum tests etc. without the need for the Mantoux test since the symptoms themselves will make obvious the need for evaluation and treatment. The only possible impact of more frequent Mantoux testing will be, on a few occasions, an earlier start to prophylactic therapy for those who test positive but have no active disease symptoms.

The plaintiff also complains that his Constitutional rights were violated when the prison officials and physicians failed to change his medication despite its potential adverse side effects. However, the plaintiff's complaint shows the antithesis of deliberate indifference. As soon as Maldonado tested positive for tuberculosis, the prison physicians began testing him to determine what kind of treatment would be effective to treat his particular strain and stage of tuberculosis. Immediately following these tests, the plaintiff was given medication.

Although the plaintiff failed to identify the medication which he claims is damaging his liver, the *DOC Control Policy* specifies Isoniazid. *DOC Control Policy* V 1. There is no dispute that this drug is known to have as a possible side effect potential damage to the liver. *See Physicians Desk Reference* 1413(1998). Indeed, the *DOC Control Policy* specifically recognizes this risk. Thus, preventative therapy (for TB2's) is recommended only for prisoners under the age of 35 or with other high risk factors. *DOC Control Policy* IV B.9. And, as in effect confirmed by the complaint, all inmates receiving Isoniazid are monitored regularly for hepatic dysfunction. *DOC Control Policy* V A.1.(a)(6).

Prescribing medication that may have side effects does not amount to "deliberate indifference" to serious medical needs as is necessary to support a claim under *Estelle.* Indeed, even a casual glance at the *Physicians Desk Reference* will make clear that most, if not all, prescription drugs have the potential of harmful side effects. What is required is that prison officials be mindful of side effects and take reasonable steps to avoid serious harm. The New Jersey DOC

has adopted policies consistent with good medical practice to fight the spread of tuberculosis. Plaintiff's own complaint makes clear that those practices were being followed in his case.

## VI

This court finds that plaintiff has failed to allege facts sufficient to support an Eighth Amendment claim of cruel and unusual punishment, and his complaint is hereby dismissed. Plaintiff's request to bring this as a class action is also denied. An appropriate order will issue on an even date herewith.